Steven R. ODENTHAL, Appellant,

v.

MINNESOTA CONFERENCE OF
SEVENTH–DAY ADVENTISTS,
Respondent,

General Conference of Seventh–Day Adventists; Minnetonka Seventh–Day Adventist Church, Defendants,

and

Lowell Rideout, Respondent.

Nos. C1–01–278, C4–01–291.

Supreme Court of Minnesota.

Aug. 15, 2002.

Ronald I. Meshbesher, Katherine S. Flom, Meshbesher & Spence, Ltd., Minneapolis, MN, Attorneys for Appellant.

Patrick Tierney, Collins, Buckley, Sauntry & Haugh, St. Paul, MN, Attorney for Respondent MCSDA.

Richard L. Pemberton, Leantha G. Wolter, Erica Gutmann Strohl, Meagher & Geer, PLLP, Minneapolis, MN, Attorneys for Respondent Rideout.

Eric E. Jorstad, Daniel J. Connolly, Bruce Jones, Faegre & Benson, LLP, Minneapolis, MN, Attorney for Amicus Curiae, Minnesota Religious Council.

## OPINION

BLATZ, Chief Justice.

Appellant Steven Odenthal filed a claim against his former minister, respondent Lowell Rideout, alleging clergy malpractice, intentional infliction of emotional distress, breach of fiduciary duty or confidential relationship, and negligence, based on Rideout's conduct in providing marriage counseling to Odenthal and his wife. Odenthal also sued the Minnetonka Seventh–Day Adventist Church, the Minnesota Conference of Seventh–Day Adventists (MCSDA), and the General Conference of Seventh–Day Adventists (collectively, the Churches) for vicarious liability, negligent training and supervision, and negligent retention. On motions for summary judgment by Rideout, the Minnetonka Seventh–Day Adventist Church, and the MCSDA,[1] the district court dismissed the clergy malpractice, emotional distress, and fiduciary duty claims against Rideout, but concluded that its jurisdiction over the negligence claim against Rideout was not prohibited by the prohibition on excessive government entanglement with religion in the First Amendment of the United States Constitution or Minnesota's prohibition on alienation-of-affection claims. Finally, finding that the MCSDA was Rideout's actual employer, the district court granted the Minnetonka Seventh–Day Adventist Church's motion for summary judgment on all claims against it, but denied the MCSDA's motion on the vicarious liability and negligence claims.

Rideout and the MCSDA appealed. The court of appeals reversed, holding that resolution of Odenthal's negligent-counseling claim unconstitutionally entangled the district court in "religious doctrine, practice, or church polity." We granted Odenthal's petition for further review and now reverse.

■ Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Goins v. West Group*, 635 N.W.2d 717, 722 (Minn.2001). On appeal from a summary judgment, the reviewing court determines whether there are any genuine issues of material fact and whether the district

1. The General Conference of Seventh–Day Adventists did not move for summary judgment, and is not a party to this appeal.

court erred in its application of the law. *Id.*

In the spring of 1997, Diane Odenthal left her husband, Steven Odenthal, to spend the night with another man. When she returned the next day, Odenthal and Diane telephoned their minister at the Minnetonka Seventh–Day Adventist Church, Lowell Rideout. Rideout instructed Odenthal to tell Diane to stay until they could meet together to discuss the Odenthals' relationship. When asked to define the purpose of the initial meeting with the Odenthals, Rideout responded: "The first purpose and a continuing purpose throughout was to try to find out what they were working with, try to understand what the presenting problems were, what they perceived were the problems." [2] Rideout testified that this meeting focused on "their thoughts, their feelings; I don't recall making any scriptural applications in the first visit, although I may have." Odenthal testified that Rideout and the Odenthals planned to continue meeting on a weekly basis.

According to Odenthal, Rideout described the early sessions as "marital counseling." Odenthal testified that the meetings opened with a prayer, but concentrated on marital issues. Rideout said he was an appropriate person to provide marital therapy, and Odenthal understood that Rideout would not have entered into the relationship if he had not felt it was appropriate. Odenthal believed Rideout had experience in the field of psychology because during their initial counseling sessions Rideout would refer to psychology classes he had taken.[3] Further, Odenthal believed Rideout had held himself out as marriage counselor because "[h]e took charge right away" and "knew exactly what to say to Diane." During one of the early sessions, however, Rideout told Odenthal that he was attracted to Diane.

Odenthal testified that he, Diane, and Rideout met once or twice every two weeks between May and August of 1997. These meetings were held at the Odenthals' home most of the time, but were occasionally held at the church or Odenthal's office.

The Odenthals also sought professional counseling during this period and met with a marriage counselor, Sandra Thorne, approximately 10 to 20 times between May and August of 1997. By August, their relationship had improved markedly: Odenthal testified that Thorne told them in one of their final sessions: "Wouldn't be surprised if I don't see you guys in here ever again because you're doing so well." The Odenthals soon renewed their marriage vows.

The Odenthals stopped seeing Thorne after they renewed their vows, but continued to see Rideout. Odenthal explained, "we were paying [to see Thorne]. Lowell was free." Odenthal explained he and Diane wanted to continue to focus on the "spiritual aspect" of their relationship, which was "[n]ot from a Bible study perspective, but from a marriage relationship, how to communicate with each other and techniques involved in keeping the communication, what we'd learned in counseling,

**2.** According to the affidavit submitted by Ellen Luepker, M.S.W., an expert witness for Odenthal, the phrase "presenting problems" is a term of art used by marriage counselors.

**3.** Rideout denied taking coursework in counseling while studying at the seminary, but stated that this was because there were only

"three different electives that a person could take in psychology, and I considered them so watered down that they wouldn't have had any special purpose for me. I was already reading widely and have continued to [do so] through the years, so I don't recall taking any of them."

keep that open, keep it going." Odenthal testified that they did not go to Rideout because they needed religious counseling, but because they needed "maintenance." Odenthal stated that he and his wife "wanted to be sure that we didn't back slide and get into the same trouble we were in."

Between August 1997 and February 1998, the Odenthals met with Rideout at least every other week, but their marriage deteriorated to the point where it was "very rocky." Odenthal indicated that Rideout administered a test or examination during this period "to determine why we were having difficulty."[4] According to Odenthal's recollection of the results, "there [were] five or six different types of personalities, and he—I was this type, Diane was this type and then to kind of give a perspective he gave us what type he was, and it was very similar to Diane's." According to Odenthal, Rideout told them "it would make it very difficult for us to have a harmonious marriage or relationship * * * because it would make us work too much. There's nothing [that] would come easy."

According to Odenthal, Rideout emphasized more than just the Odenthals' personality differences:

[O]ne of the things that came out about Diane not liking about me was that I wasn't thin enough, I wasn't effeminate. She liked the feminine men, kind of in-

tellectual, and he concluded that her horrible relationship with her father and being raised by her older sister, she may have some lesbian tendencies or some tendencies toward a feminine type man * * *.

According to Odenthal, Rideout noted to him, "Clearly, you are not [effeminate]."

During the fall and winter of 1997–1998, Odenthal began to believe that Diane was shutting him out and beginning to form an attachment to Rideout. He testified that Rideout and Diane met at the Odenthals' home, but he was not made aware of the sessions at the time. Odenthal was concerned the relationship between Diane and Rideout "was becoming personal, crossing personal bounds, that she was no longer looking up to him as somebody who knew what he was talking about and could impart advice but more as a close friend."

In February 1998, Rideout changed the composition of his sessions with the Odenthals. According to Odenthal, "it was staying the same, and we weren't getting any better, so [Rideout] thought he should bring other people into the mix * * *." Dan Odenthal (Steven Odenthal's brother) and Kathy Just (a member of the congregation with counseling experience) began attending the sessions. Rideout may have performed another evaluation during one of the sessions when Dan Odenthal was present.[5] After three or four sessions,

4. Odenthal testified that it was similar to a questionnaire that a psychologist, John Stolle, later administered. The examination took about 30 minutes. Rideout asked them questions; both Odenthal and Diane gave answers. Rideout wrote down the scores and gave them the results that day, before he left their house. Rideout stated that he did not recall administering such a test to the Odenthals although he noted "[i]f Steven says I did, if Diane says I did, I may have." (Diane testified in deposition that there was no such test.) Rideout stated that the test he may

have given, "is not a psychological test, it is not a psychological profile, it is merely an inventory of what that couple has going for them and may not have going for them." Rideout agreed, however, that the examination could be characterized as a "personality inventory" or "personality evaluation" designed to evaluate compatibility between spouses.

5. Steven Odenthal testified about a second examination from the summer of 1998 that his brother had referenced but "we don't

Just told Rideout that she and he "were too personally involved with the Odenthals to provide them with adequate marital counseling, due in part to the fact that we were good friends with both of them and that they had significant marital issues." The Odenthals soon began meeting with another psychologist, John Stolle. But at approximately the same time, Diane and Rideout began meeting at the Odenthals' home, alone except for one of the Odenthals' children.

In May of 1998, Diane attended an out-of-town seminar with many members of the Minnetonka Seventh–Day Adventist Church, including Rideout and Kathy Just. Steven Odenthal did not attend the conference. Just testified:

> Numerous times during the seminar, Diane sought and received counsel from Lowell Rideout regarding her problems with Steven. Some of those sessions took place in Diane's motel room. After the seminar, Rideout and Diane Odenthal chose to walk the approximate three miles back to the motel, rather than ride with the rest of the church members. Diane Odenthal walked barefoot, and I later became aware that Rideout had carried her across certain places.

According to Odenthal, when the group returned from the conference, Rideout told him Diane "acts a little bit differently when she's—when she's out in public and away from you[,] * * * she kind of lets her hair down, and does things that she—that I don't normally see her do in other places." Odenthal testified that Rideout said, "if I make myself available to Diane tonight, she would run off with me." Finally, Rideout "identified himself as [Diane's] fantasy man," the composite of "those qualities she likes about a man." Regarding the comment about his availability, Rideout admitted that he had used "words to that effect," but characterized the remark as "something [that] had to be said that would suggest to [Odenthal that] he needed to sit up and take notice of how inattentive he was to her needs * * *."

Diane's relationship with Rideout was discussed toward the end of the Odenthals' counseling relationship with John Stolle. According to Odenthal, Stolle told them, "you need to stay away from Lowell Rideout and you need to quit listening to him for advice and you need to switch churches, if that's what it takes to stay away from [him]." [6] Odenthal testified that Stolle told Diane that she was having an "emotional affair" with Rideout. According to Odenthal, when Diane told Rideout about Stolle's advice, Rideout called Odenthal and requested a meeting. At that meeting, Rideout told Odenthal "no counselor in his right mind would say such a thing." [7]

know what it was. It was in a folder wherein [Rideout] asked us questions, specific questions that he was obviously reading from, and then when he left, he put it in the folder and went home, and I don't know if that was a test, I don't know exactly what it was. I assumed it was some sort of questionnaire, slash, test." Odenthal stated that that examination "probably didn't have anything to do with [the] kind of test" described by Rideout.

**6.** A similar sentiment was expressed by marriage counselor Sandra Thorne in 1999. Diane testified that Thorne "said that she was concerned that [the] relationship [between Diane and Rideout] was hazardous."

**7.** When asked about statements by the professional counselors who had treated the Odenthals, Sandra Thorne and John Stolle, Rideout stated: "Had those counselors known precisely what [Diane] was working with, they could not have in good conscience urged her to go back to him, and I don't think as responsible counselors they would have." Rideout equivocated over whether he told Odenthal that "no counselors in their right mind would tell Diane to stay away from [Rideout] and switch churches." While he

The Odenthals left the Minnetonka Seventh–Day Adventist Church for three or four months. When they returned to the church, they also returned to joint counseling with Rideout. The Odenthals had joint sessions with Rideout until around October of 1998, after which they met with him individually. Odenthal testified that they returned to Rideout because Odenthal believed "there was something wrong with my spirituality if I'm thinking bad things about my wife and my pastor." He also testified that their counseling was based on "the old relationship stuff."

The point at which Diane and Rideout's relationship became romantic is open to speculation, but Diane testified that she realized she had strong feelings for Rideout in the winter of 1998–99. Diane and Rideout told each other that they were in love in May 1999. They did not tell Odenthal, whom Rideout continued to counsel until August 1999. In June 1999, Diane went to Mankato to stay with her sister. When she returned to live with Odenthal, Rideout was angry and told Diane she was making a mistake to try to reconcile with Odenthal.

Odenthal testified that in his final counseling sessions with Rideout, Rideout was "pretty much telling me there's nothing I could do, that if God wanted Diane to be in love with me, she would be." According to Odenthal, Rideout said, "You guys weren't right for each other from the beginning, and I'm not holding out any hope as far as a good solution or a good ending to this."

In September 1999, upon complaints from several members of the congregation about the relationship between Rideout and Diane, the president of the MCSDA counseled Rideout to resign. According to

Odenthal, "I broke down at that point. I couldn't believe it. You mean this is all true? I wasn't losing my mind this whole time? * * * I thought I was going crazy * * *." Rideout resigned, and both the Odenthals and Rideout and his wife soon filed for divorce. Rideout and Diane married shortly after their divorces were final.

Odenthal brought an action for clergy malpractice, intentional infliction of emotional distress, breach of fiduciary duty or confidential relationship, and negligence against Rideout. He also alleged vicarious liability, negligent training and supervision, and negligent retention against the Churches. Each of the defendants except the General Conference of Seventh–Day Adventists moved for summary judgment on the basis that the district court lacked subject matter jurisdiction, arguing that the lawsuit was for (1) clergy malpractice, which courts cannot adjudicate under the First Amendment, and (2) alienation of affections, a cause of action not recognized in Minnesota.

The district court dismissed the clergy malpractice claim, concluding that Minnesota does not recognize this tort. The district court also dismissed the fiduciary duty claim on the basis that it is an equitable cause of action and Odenthal could not recover the legal damages he sought for emotional distress and economic losses. Addressing the negligence claim, the district court raised the question whether Rideout's conduct, not as a pastor (which the district court concluded would entangle the court with religion in violation of the First Amendment) but as an unlicensed mental-health practitioner, can give rise to

initially stated that he doubted making such a statement, he also stated that if he had made such a remark it would have meant that "if [the counselors] had been privy to the infor-

mation [I was] privy to, they would not in good conscience recommend she go back and work on that marriage."

a cause of action in tort.[8] The court concluded that the legislature did not intend to prevent alienation-of-affection claims against unlicensed marriage counselors, and that Rideout's conduct fit the definition of an unlicensed marriage counselor.[9] In contrast, the court concluded that the emotional distress claim against Rideout was not based on the regulated counseling relationship, and therefore was proscribed by Minnesota's general prohibition of alienation-of-affection claims.

Turning to the claims against the Churches, the district court granted the Minnetonka Seventh–Day Adventist Church's motion for summary judgment, finding that the MCSDA and not the Minnetonka Seventh–Day Adventist Church was Rideout's employer. The court further concluded that Rideout's negligence occurred within church-supported counseling, and that liability could be therefore determined based on secular criteria such as the MCSDA's knowledge of prior and contemporaneous allegations of misconduct. Thus, the court denied the MCSDA's motion for summary judgment.

Rideout and the MCSDA appealed. The court of appeals limited the appeal to the "sole issue of constitutional limitations on the exercise of subject-matter jurisdiction" and reversed, concluding that the district court erred in using the Seventh–Day Adventist Church Minister's Handbook to distinguish pastoral and secular counseling:

> By interpreting and analyzing the language and intent of the ministers handbook, the district court did precisely what the First Amendment forbids, resulting in the excessive entanglement of the district court in religious doctrine, practice, or church polity. Resolution of the negligent counseling claim would therefore violate the First Amendment.

*Odenthal v. Minnesota Conference of Seventh–Day Adventists*, 632 N.W.2d 783, 789 (Minn.App.2001) (citations omitted). The court did not address the claims against the MCSDA.

I.

■ This case raises the issue of whether a court has subject matter jurisdiction over a claim for negligent counseling against a member of the clergy, as both the federal and state constitutions limit the role of secular courts in resolving religious disputes. Subject matter jurisdiction is a question of law, which we review de novo. *Kellar v. Von Holtum*, 605 N.W.2d 696, 700 (Minn.2000).

A.

■ We first address the federal constitutional limitations on a court's exercise of jurisdiction. The First Amendment provides, "Congress shall make no law respecting an establishment of religion, or

---

8. While the district court used the Minnesota Conference of Seventh–Day Adventist's Minister's Handbook in its initial conclusion that Rideout exceeded the scope of his authorized pastoral counseling as a minister of the Seventh–Day Adventist church, the court also concluded that his counseling sessions with the Odenthals were within the scope of Minnesota's statutory regulation of unlicensed mental health practitioners, Minn.Stat. §§ 148B.60–.71 (1998).

9. In 1978, the legislature abolished civil actions "based upon alleged alienation of affections, criminal conversation, seduction and breach of contract to marry * * *." Minn. Stat § 553.01–.03 (2000). The district court decided that Odenthal's claim for negligent counseling was distinguishable from a common-law alienation-of-affection claim because it was based on a theory of negligent conduct within a counseling relationship. It then concluded that because the negligence claim was not based on alienation of affection, it was not precluded by Chapter 553.

prohibiting the free exercise thereof * * *." U.S. Const. amend. I; *see also Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940) (applying religious protections to state actions). The First Amendment applies to both legislative and judicial power. *Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191, 80 S.Ct. 1037, 4 L.Ed.2d 1140 (1960). Under *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), a state action must have a secular purpose, must neither inhibit nor advance religion in its primary effect, and must not foster excessive governmental entanglement with religion. *Id.* at 612–13. It is this third prong—the risk of civil courts becoming entangled in religious practice when adjudicating a negligence claim—that is the focus of this appeal. Under the entanglement doctrine, a state may not inquire into or review the internal decisionmaking or governance of a religious institution. *Jones v. Wolf*, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

Most of the early entanglement doctrine cases dealt with church membership or property disputes; the United States Supreme Court concluded that for purely religious questions, hierarchical religious organizations are afforded the "power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Presbyterian Church v. Hull Church*, 393 U.S. 440, 448, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (quoting *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116, 73 S.Ct. 143, 97 L.Ed. 120 (1952)). In *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976), the Supreme Court reviewed a ruling by a state supreme court that held the church's proceedings were "procedurally and substantively defective under the internal regulations of the Mother Church and were therefore arbitrary and invalid." *Id.* at

698, 96 S.Ct. 2372. The Supreme Court reversed, holding that "the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them." *Id.* at 709, 96 S.Ct. 2372.

■ There is no entanglement problem, however, when the dispute can be resolved according to "neutral principles of law"— that is, by rules or standards that have been developed and are applied without particular regard to religious institutions or doctrines. *Jones*, 443 U.S. at 602–04, 99 S.Ct. 3020. We adopted the neutral principles test in *Piletich v. Deretich*, 328 N.W.2d 696, 701 (Minn.1982), a case concerning church membership and control of church property arising out of the same schism in the Serbian Eastern Orthodox Church that gave rise to *Milivojevich*. Because the issues in *Piletich* were not doctrinal but instead determined property ownership and membership qualifications, we applied our previous case law—neutral standards of law—to the deeds, the local charter and bylaws of the congregation, and to the constitution of the church itself. *Piletich*, 328 N.W.2d at 702–03.

Then in *Hill–Murray Federation of Teachers v. Hill–Murray High School*, we held that requiring a Catholic school to abide by the Minnesota Labor Relations Act (MLRA) did not result in excessive entanglement. 487 N.W.2d 857, 864 (Minn.1992). We characterized the MLRA as a "limited governmental regulation of purely secular aspects of a church school's operation." *Id.* We concluded that allowing lay teachers to bargain collectively would not alter or impinge upon the religious character of the school, and thus

there was no excessive entanglement with religion. *Id.*

■ Applying these principles to a negligence action, a court has subject matter jurisdiction over claims against a member of the clergy if neutral principles of law establish the standard of care applicable to the clergy member.[10] These principles of law must be developed and applied without particular regard to religious institutions or doctrines. *Jones*, 443 U.S. at 602–04, 99 S.Ct. 3020. In *Piletich* and *Hill–Murray*, we concluded that the property and collective-bargaining principles, respectively, were neutral principles. In this case, Odenthal offers several neutral principles of law that he argues can be applied without regard to religious institutions or doctrines. Specifically, Odenthal points to three statutes: statutes regarding unlicensed mental health practitioners, Minn. Stat. §§ 148B.60–.71 (1998); statutes setting forth licensure requirements for marital and family counselors, Minn.Stat. §§ 148B.29–.39 (1998); and statutes creating a cause of action for sexual exploitation by a psychotherapist, Minn.Stat. §§ 148A.01–.05 (2000).

■ In addition to his argument regarding the statutes, Odenthal also contends that Rideout should be held to secular

standards because he exceeded the pastoral duties described in the Seventh–Day Adventist Minister's Handbook. As a statement of the church's policy regarding pastoral counseling, the Minister's Handbook poses a serious risk of religious entanglement for a court attempting to discern its limits, however. Thus, Odenthal must state a cause of action in negligence by reference to neutral standards and not by reference to the Minister's Handbook. Because it appears that only the statutes regulating unlicensed mental health practitioners are implicated on the summary judgment record before us,[11] we consider only Minn.Stat. §§ 148B.60–.71.

Minnesota Statutes sections 148B.60–.61 establish the office of mental health practice, which investigates complaints and takes and enforces disciplinary actions against unlicensed mental health practitioners. Minn.Stat. § 148B.61, subd. 1 (2000). Further, the statute sets out a detailed list of prohibited conduct, including conduct "demonstrating a willful or careless disregard for the health, welfare, or safety of a client * * *." Minn.Stat. § 148B.68, subd. 1(f) (1998). Odenthal posits that this statute provides the court with a neutral principle of law to apply to

---

**10.** This court has noted:

> Negligence is the breach of legal duty. It is immaterial whether the duty is one imposed by the rule of common law requiring the exercise of ordinary care not to injure another, or is imposed by a statute designed for the protection of others. In either case the failure to perform the duty constitutes negligence, and renders the party liable for injuries resulting from it. * * * All that the statute does is to establish a fixed standard by which the fact of negligence may be determined.

*Osborne v. McMasters*, 40 Minn. 103, 105, 41 N.W. 543, 543–44 (1889).

**11.** In particular, we find no evidence in the record establishing a material issue of fact

regarding sexual contact between Rideout and Diane Odenthal during the counseling relationship or afterwards under the conditions described in Minn.Stat. § 148A.02(2) (2000). In addition, while the statute regarding marital counseling requires licensure, Odenthal fails to cite any standards of conduct applicable to a licensed marital counselor that might be applied in a negligence action. While such standards may exist, *see* Minn. R. 5300.0350, subp. 4 (2001) (setting forth code of ethics for licensed marriage and family therapists), we decline to address whether these standards constitute neutral principles that could be applied in the absence of a citation or reference to these standards by Odenthal.

Rideout's conduct without becoming entangled with religion.

1.

A preliminary question is whether Rideout meets the definition of an unlicensed mental health practitioner, and whether deciding that question necessarily entangles the court in religion. The definitions provide:

Subd. 3. "Unlicensed mental health practitioner" or "practitioner" means a person who provides or purports to provide, for remuneration, mental health services as defined in subdivision 4. It does not include persons licensed by * * * the board of marriage and family therapy * * *; or another licensing board if the person is practicing within the scope of the license; members of the clergy who are providing pastoral services in the context of performing and fulfilling the salaried duties and obligations required of a member of the clergy by a religious congregation. For the purposes of complaint investigation or disciplinary action relating to an individual practitioner, the term includes:

* * * *

(3) clergy who are providing mental health services that are equivalent to those defined in subdivision 4.

Subd. 4. "Mental health services" means psychotherapy and the professional assessment, treatment, or counseling of another person for a cognitive, behavioral, emotional, social, or mental condition, symptom, or dysfunction, including intrapersonal or interpersonal dysfunctions. The term does not include pastoral services provided by members of the clergy to members of a religious congregation in the context of performing and fulfilling the salaried duties and obligations of a member of the clergy by that religious congregation.

Minn.Stat. § 148B.60 (1998). Rideout focuses on the requirement in the statute for remuneration (the Odenthals did not pay Rideout), and the exclusion of pastoral counseling performed by members of the clergy in the context of their duties to a member of. their religious congregation. In contrast, Odenthal advocates the district court's interpretation of subdivision 3, that for the purposes of complaint investigation or disciplinary action against individual practitioners, the term includes "clergy who are providing mental health services * * *." *Id.*, subd. 3.

As Rideout notes, the statute twice excepts clergy "who are providing pastoral services in the context of performing and fulfilling the salaried duties and obligations required * * * by a religious congregation." *Id.; see also id.*, subd. 4. However, for purposes of complaint investigation or disciplinary action, the legislature explicitly *included* clergy providing services equivalent to mental health services as defined. *Id.*, subd. 3(3). We note that the definition of mental health services is on its face more specific and detailed than the reference to "pastoral services." Therefore, in concert with the rules of statutory construction, we interpret the mental health services described in subdivision 4 to be an exception to the more general pastoral services as described in the statute. *See* Minn.Stat. § 645.26 (2000) (providing interpretation of statutes should attempt to give effect to all provisions but in the event of irreconcilable provisions, specific controls over general). To adopt Rideout and the MCSDA's interpretation would read out of the statute the very explicit language that clergy providing the equivalent of mental health services be included.

Accordingly, we look to the definition of mental health services to determine whether Rideout's counseling is encompassed

within the scope of the statute and is therefore subject to regulation and a negligence lawsuit based on the standards set forth therein. *See* Minn.Stat. § 148B.60, subd. 4. Rideout meets the definition of an unlicensed mental health practitioner if he provided services equivalent to psychotherapy or the professional assessment, treatment, or counseling of another person for a cognitive, behavioral, emotional, social, or mental condition, symptom, or dysfunction, including intrapersonal or interpersonal dysfunctions. *See id.*

■ First, however, we turn to the question of whether applying this standard to Rideout entangles the court in religion. We note that the statutory definition of mental health services is neutral on its face—it describes "assessment, treatment, or counseling" without regard to whether religious or spiritual principles are involved. While the counseling or treatment relationship may arise in many contexts, including the context of a clergy and church member, the statute provides a neutral and secular description of the purpose and character of the counseling relationship.

Rideout appears to argue that because we will have to determine what aspects of the counseling relationship are religious and what aspects are secular, the court will become entangled in religion. However, Rideout fails to identify how determining whether a person is providing "assessment, treatment, or counseling" for the conditions described in the statute requires any inquiry into the religious aspect of the relationship. Therefore, we see no need to parse out secular and religious counseling to apply this definition, and its application does not "alter or impinge upon the religious character" of the relationship. *Hill–Murray*, 487 N.W.2d at 864. Therefore, applying the statutory definition of

mental health services does not excessively entangle the courts in religion. *See id.*

■ The district court found that Rideout's conduct satisfied the definition of mental health services because he counseled the Odenthals on their interpersonal dysfunctions. The record before us supports the district court's finding and further illustrates the absence of prohibited entanglement with religion. Viewing the evidence in the light most favorable to the nonmoving party, *see Goins,* 635 N.W.2d at 722, the record appears to contain many examples in which Rideout either purported to or did provide secular therapy for interpersonal dysfunctions:

• Rideout initially referred to his sessions with the Odenthals as "marital counseling." A troubled marriage is arguably an "interpersonal dysfunction" under Minn.Stat. § 148B.60, subd. 4. The counseling continued for over two years, ranging in frequency from weekly to monthly; the majority of these meetings occurred outside the church. Rideout brought in non-clergy third parties, at least one of whom understood they were providing marital counseling, with the specific purpose of assisting the Odenthals with their marital problems.

• Rideout discussed his psychology coursework in the sessions with the Odenthals and used a term of art in the counseling field—"presenting problems"—when describing his contacts with the Odenthals.

• Rideout assessed the Odenthals' dysfunctions, attempting "to understand what the presenting problems were * * *." To this end, he may have conducted up to three psychological or personality examinations during his sessions with the Odenthals. Rideout assessed the Odenthals' personality

types at length and attempted to explain why they were having problems.

- Rideout attempted to modify Odenthal's behavior by suggesting that Diane would run away with him if he asked.
- Rideout challenged the opinions of two professional counselors who advised the Odenthals not to meet with Rideout, claiming that these counselors did not understand the situation as well as he did and suggesting his approach and advice was superior to that of the professionals.

Based on the record at this summary judgment stage and viewing the evidence in the light most favorable to Odenthal, we believe Rideout's conduct falls within the embrace of the statute because it constitutes the assessment, treatment or counseling of another for an interpersonal dysfunction or the equivalent. *See* Minn.Stat. § 148B.60, subds. 3(3), 4. Therefore, the district court did not err in concluding that Rideout provided mental health services to the Odenthals.

 Turning to Rideout's other argument, Rideout claims he cannot be considered a mental health practitioner because he was not compensated by the Odenthals and the statute requires remuneration in the definition of unlicensed mental health practitioner. *See id.*, subd. 3. The district court concluded that the remuneration requirement does not apply to clergy providing mental health services. Determining whether remuneration is required requires a careful reading of subdivision 3. This subdivision begins with a statement that the term "mental health practitioner" includes a person who provides, for remu-

neration, mental health services as defined in subdivision 4. The statute then lists categories of those excluded from the definition. Finally, subdivision 3 states that "the term"—which read in context means "mental health practitioner"—includes, for "purposes of complaint investigation or disciplinary action relating to an individual practitioner," certain persons listed. In this latter category, clergy providing mental health services are identified and there is no remuneration requirement. Thus, there is no remuneration requirement for those, such as Odenthal, included in the definition of mental health practitioner for purposes of complaint investigation or disciplinary action.

 Further, even if we were to conclude that the statute required remuneration for such persons, the statute is silent as to the source of remuneration and does not explicitly require that such funds originate from the counselee.[12] Here, the plain meaning of the word "remuneration" simply requires that the unlicensed mental health practitioner be paid by someone or some entity. By requiring only remuneration without identifying the source, the legislature apparently sought to exempt only those providing counseling on a volunteer basis. Therefore, if remuneration is required, it is sufficient that an unlicensed mental health practitioner be remunerated from any source. Because the record indicates Rideout was compensated by the MCSDA, in part, to provide counseling to parishioners, he provided mental health services for remuneration. Thus, we conclude that the district court did not err in adjudicating the issue or in concluding, for the purpose of resolving the motions for

---

12. This interpretation is buttressed by another provision of the same statute, which contemplates payment from an entity other than the person being counseled. *See* Minn.Stat. § 148B.71, subd. 1(f) (2000) (requiring unlicensed mental health practitioners to disclose to each client the names of insurance companies that have agreed to reimburse the practitioner).

summary judgment, that Rideout provided mental health services to the Odenthals.

### 2.

Having determined that the court can adjudicate whether Rideout meets the statutory definition of an unlicensed mental health practitioner as part of a negligence action, and that the court did not err in its conclusion on that issue, we turn next to the standard of conduct to be applied in determining whether Rideout was negligent, and whether that application entangles the court in religion.[13] Odenthal argues the legislature set forth neutral principles of conduct for unlicensed mental health practitioners in Minn.Stat. § 148B.68 (1998) that may be used to establish negligence. Section 148B.68 sets forth conduct that is prohibited and subject to discipline, including:

(f) Conduct likely to deceive, defraud, or harm the public; or demonstrating a willful or careless disregard for the health, welfare, or safety of a client; or any other practice that may create unnecessary danger to any client's life, health, or safety, in any of which cases, proof of actual injury need not be established.

\* \* \* \*

(k) Revealing a communication from, or relating to, a client except when otherwise required or permitted by law.

\* \* \* \*

(q) Undertaking or continuing a professional relationship with . a client in which the objectivity of the professional would be impaired.

These standards are secular on their face—they describe conduct without reference to a religious aspect to the relationship or the conduct.

While neither Rideout nor the MCSDA expressly addresses the applicability of the section 148B.68 standards, Rideout specifically takes issue with the application of any breach of confidentiality standard, arguing that it would entangle the court with religion. *See* Minn.Stat. § 148B.68(k). In support of his argument, Rideout cites a Missouri Court of Appeals case holding that the rule that "a spiritual advisor does not divulge communications received in that capacity \* \* \* describes a moral, not a legal duty." *Hester v. Barnett,* 723 S.W.2d 544, 554 (Mo.Ct.App.1987). Rideout also cites a New York Court of Appeals case, *Lightman v. Flaum,* 97 N.Y.2d 128, 736 N.Y.S.2d 300, 306, 761 N.E.2d 1027 (2001), declining to adjudicate a claim of breach of fiduciary duty based on the disclosure of clergy-penitent privileged communications, because to do so would require the court to determine whether the disclosure was in accord with religious tenets. These cases are not persuasive, however, as there is no indication that the legislatures in Missouri or New York had attempted to regulate the conduct at issue through a law of neutral application, such as has been enacted in Minnesota.

In this case, the standards of conduct for those providing mental health services apply to all who meet the definition of unlicensed mental health practitioner, regardless of whether the relationship is one of clergy and church member. The statutory standards identified by Odenthal as establishing negligence, including protecting the health, safety and welfare of clients, the confidentiality of communications, and the impartiality of the mental health professional, do not suggest any unique or distinct application with respect to clergy. Other than the argument re-

---

13. In discussing application of these standards, we do not decide that Rideout violated the standards or was negligent, but leave that determination for trial.

garding confidentiality, Rideout and the MCSDA fail to even argue how application of these standards would affect the religious aspect of the counseling relationship. In the absence of any such allegation, application of these standards does not appear to "alter or impinge upon the religious character" of the relationship. *Hill–Murray*, 487 N.W.2d at 864.

Finally, the respondents argue that negligence actions against clergy, such as Odenthal's, constitute clergy malpractice claims, which are barred under the First Amendment because they involve excessive entanglement. *See Dausch v. Rykse*, 52 F.3d 1425, 1432 n. 4 (7th Cir. 1994) (Coffey, J., concurring) (citing state court cases holding clergy malpractice claims are constitutionally prohibited). Specifically, the respondents claim that asserting jurisdiction would require the court to define the job duties of ministers and determine when the counselor is acting as clergy. We disagree. As illustrated above, applying neutral statutory principles that do not require any reference to or assessment of a religious component, the court could conclude that Rideout was acting as an unlicensed mental health practitioner, and the court or jury can determine whether he violated the standards of conduct set forth in section 148B.68. Because these standards appear to be neutral with respect to religion, they can be applied without excessive entanglement. *See Jones*, 443 U.S. at 602–04, 99 S.Ct. 3020; *see also Dausch*, 52 F.3d at 1433 ("if a complaint alleges that the psychological services that were provided were 'secular' in nature, or that the provider held himself

out to be providing the services of a psychological counselor, the negligence claim cannot be characterized as one for clergy malpractice.") (Coffey, J., concurring). Therefore, we hold the district court properly concluded that on this summary judgment record it has jurisdiction to adjudicate Odenthal's negligence claim,[14] and therefore reverse the court of appeals.

## B.

Rideout argues that if the federal constitution does not prohibit courts from adjudicating Odenthal's claim, the Minnesota Constitution does. Article I, section 16 provides:

**Freedom of conscience; no preference to be given to any religious establishment or mode of worship.** The enumeration of rights in this constitution shall not deny or impair others retained by and inherent in the people. The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state, nor shall any money be drawn from the treasury for the ben-

14. Even where neutral principles of law do not entangle a court in religion, jurisdiction may be prohibited when application of those principles unduly burdens the free exercise of religion. *Employment Div., Dep't of Hum. Resources of Or. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Neither Rideout nor the MCSDA claim that imposition of a negligence standard of care to the counseling conduct unduly burdens the free exercise of religion under the federal constitution, and we therefore do not address this issue.

efit of any religious societies or religious or theological seminaries.

Minn. Const. art. I, § 16. Thus, the state constitution protects the right to free exercise of religion and prohibits the establishment of religion or the giving of a preference to any religion or mode of worship. *Id.* The Minnesota Constitution affords greater protection to the exercise of religious liberty than does the federal constitution. *State v. Hershberger,* 462 N.W.2d 393, 397 (Minn.1990). Rideout argues that section 16 prohibits all state interference with freedom of conscience and requires a weighing of conflicting interests whenever rights of conscience are implicated by state action.

■■■ Under section 16, we consider whether: (1) the objector's belief is sincerely held; (2) the state action burdens the exercise of religious beliefs; (3) the state's interest is overriding or compelling; and (4) the state action uses the least restrictive means. *Hill–Murray,* 487 N.W.2d at 865. As an initial matter, and as we stated in *Hill–Murray,* it is not the province of the court to examine the reasons for a religious belief. *Id.* Thus, although it is not at all clear exactly what religious belief Rideout and the MCSDA contend is at issue, for the purpose of the analysis we recognize the presence of a sincerely held religious belief. *See id.*

■■ We turn then to consider the extent to which the state action imposes a burden on the exercise of religion. In *Hill–Murray,* we held that despite the obligation to comply with the MLRA, the school, "retains the power to hire employees who meet their religious expectations, to require compliance with religious doctrine, and to remove any person who fails to follow the religious standards set forth." *Id.* at 866. Similarly, despite the standards regulating unlicensed mental health professionals, a clergy member retains the ability to provide spiritual counseling and guidance, and a church retains the power to require compliance with its doctrinal teachings by the clergy member providing counseling. The statutory standards implicated by the summary judgment record require only that the clergy member (1) not engage in willful or careless disregard of the health, welfare, or safety of a client, or create unnecessary danger to life, health or safety; (2) not reveal confidential communications obtained while providing mental health services; and (3) not engage in counseling or treatment when one's objectivity is impaired. Minn.Stat. § 148B.68 (f), (k), (q). These standards establish a floor of acceptable conduct for mental health professionals that allows for incorporation of spiritual or religious aspects to the treatment or counseling.[15] Therefore, there is no impermissible burden on the exercise of religion.

Rideout next argues that the state does not have a compelling interest in regulating mental health counseling performed by clergy, and points to the legislature's exclusion from regulation of unlicensed mental health professionals members of the clergy providing pastoral services as required by a religious congregation. *See* Minn.Stat. § 148B.60, subd. 3. As set forth above, however, the statute when read in full does not exempt clergy performing

---

**15.** While neither Rideout nor the MCSDA have identified a conflict between statutory standards and church doctrine, Rideout claims that adjudication of the negligence action necessarily requires the court to consider and interpret the Seventh–Day Adventist Church Minister's Handbook and the guidelines delineated therein. We disagree. In this context we apply neutral principles of law, and—except as discussed above—neither Rideout nor the MCSDA explain how application of any of the section 148B.68 standards burdens the exercise of religion.

mental health counseling. The legislature specifically intended to regulate, among others, clergy engaging in "psychotherapy and the professional assessment, treatment, or counseling of another person," Minn.Stat. § 148B.60, subds. 3(3), 4, and the exemption for pastoral services does not swallow the expressed intentions of the legislature. Indeed, the rubric of laws regulating mental health professionals, licensed and unlicensed, evinces the legislature's concern that these practitioners not abuse their inherent authority and influence over clients, many of whom are vulnerable to such abuse. *See* Minn.Stat. §§ 148B.32–.33 (2000) (governing standards for marriage and family therapy), 148B.60–.71 (governing unlicensed mental health professionals). Given the frequently vulnerable nature of those receiving mental health services, the state's interest in their safety and well-being is compelling.[16]

Finally, we consider whether the state has used the least restrictive method of regulating counseling provided by clergy members. *Hill–Murray*, 487 N.W.2d at 867. The state regulates only conduct that meets the definition of mental health services, "psychotherapy and the professional assessment, treatment, or counseling of another person for a cognitive, behavioral, emotional, social, or mental condition, symptom, or dysfunction, including intrapersonal or interpersonal dysfunctions." Minn.Stat. § 148B.60, subd. 4. The statute does not reach any spiritual advice or guidance from a clergy member, but contemplates a formal counseling relationship to address particular mental or interpersonal

dysfunctions. It is reasonable to assume that counselees with such dysfunctions are those most in need of protection against the statutorily prohibited conduct of counselors, and thus the statute appears to be tailored in a non-restrictive manner. In sum, applying the criteria we articulated in *Hill–Murray* to Rideout's claim under the Minnesota Constitution, we hold that application of the standards set forth in Minn. Stat. §§ 148B.61–.71 does not violate article I, section 16.

## II.

The court of appeals did not address Odenthal's claim for vicarious liability, negligent training and supervision, and negligent retention against MCSDA. In addition, because the parties focused their briefing and argument before this court on the issue of Rideout's individual liability, the claims against the MCSDA were not sufficiently developed before this court. Therefore, we remand to the court of appeals for consideration of whether the district court has subject matter jurisdiction over Odenthal's claims against the MCSDA in accordance with the ruling of this court.

Reversed and remanded to the court of appeals.

GILBERT, J., took no part in the consideration or decision of this case.

MEYER, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

16. We also note the framers' intent that article I, section 16, "shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state * * *." While the prohibited conduct described in section 148B.68 is inconsistent with the safety of the state and its mental

health consumers, we nevertheless examine the means of preventing such conduct to determine whether it could be accomplished through less-restrictive regulation of religious expression. *Hershberger*, 462 N.W.2d at 398–99.