LILLEHAUG, Justice
(dissenting).
Today the court creates what is, essentially, an absolute privilege to defame in “formal church discipline proceedings.” No matter how false and malicious the statement, and no matter how much the victim is damaged, there is no remedy whatsoever in Minnesota’s courts.
The United States Supreme Court’s jurisprudence on ecclesiastical abstention does not require this rule of law. Further, its categorical nature is contrary to our controlling precedent; In Odenthal v. Minnesota Conference of Seventh-Day Adventists, 649 N.W.2d 426 (Minn.2002), we established the framework for liability for torts committed within religious organizations. Odenthal held that, although we may not inquire into or review the internal decisionmaking or governance of a religious organization, we may apply neutral principles of law if we can.do so without excessive entanglement. Id. at 435-38.
Instead of following the Odenthal framework, the court simply labels it a “complicated and messy inquiry” and announces a new rule. Because the opinion of the court undermines the doctrine of stare de-cisis and may deprive victims of a remedy, I respectfully dissent.
*543 I.
It is black-letter constitutional law that we may not decide controverted questions of religious faith. See Watson v. Jones, 80 U.S. (13 Wall.) 679, 729-80, 20 L.Ed. 666 (1872); Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am., 344 U.S. 94, 116-16, 73 S.Ct. 143, 97 L.Ed. 120 (1952); Serbian E. Orthodox Diocese for the U.S. of Am. & Can. v. Milivojevich, 426 U.S. 696, 708-10, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). As we acknowledged in Odenthal, “a state may not inquire into or review the internal decisionmaking or governance of a religious institution.” 649 N.W.2d at 435 (citing Jones v. Wolf, 443 U.S. 595, 602, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979)).
But we may decide a case involving a religious organization when the dispute can be resolved according to “neutral principles of law.” Id. at 435; Presbyterian Church in the U.S. v. Mary Elisabeth Blue Hull Mem’l Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). There is no “compulsory deference to religious authority.... where no issue of doctrinal controversy is involved.” Jones v. Wolf, 443 U.S. 595, 605, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). As we said recently in State v. Wenthe, 839 N.W.2d 83, 90 (Minn.2013): “No entanglement problem exists ... when civil courts use neutral principles of law--rules or standards that have been developed and are applied without particular regard to religious institutions or doctrines — to resolve disputes even though those disputes involve religious institutions or actors.”
The most recent Supreme Court case applying the ecclesiastical abstention doctrine, Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC, — U.S. —, 132 S.Ct. 694, 181 L.Ed.2d 650 (2012), is . consistent .with. this principle. The court held that applying federal anti-discrimination employment law to ministerial employees would interfere with religious organizations’ internal governance. Id. at —, 132 S.Ct.. at 706. To do so would constitute “government interference with an internal church decision that affects the faith and mission of the church itself.” Id. at —, 132 S.Ct. at 707.
The issue in Hosanna-Tabor, — the criteria for hiring and terminating ministerial employees — went directly to the heart of religious organizations’ missions. “The church must be free to choose those who . will guide it on its way.” Id. at —, 132 S.Ct. at 710. But the opinion of the court took care not to express a view on other types of suits, including tort claims that might be brought by an employee against a religious employer. Id. at —, 132 S.Ct. at 710.
Here, the court admits that neither Hosanna-Tabor nor any other U.S, Supreme Court case “speaks directly to the issues raised by the Pfeils’ claims.” The U.S. Supreme Court has never suggested that the First Amendment requires what the court does today. Therefore, in the absence of higher and contrary judicial authority, we should apply our own controlling case, Odenthal, that established ■ the framework to analyze state tort claims against religious organizations.
■ The tort claim alleged in Odenthal was for negligence in counseling. The plaintiff invoked several ^statutes ■ governing the conduct of unlicensed mental-health practitioners. 649 N.W.2d at 436-37. The defendants, a minister and a religious organization, argued that the application of a tort standard of care drawn from a secular regulatory statute was barred by the First Amendment because adjudication wduld entangle the court in religion. Id. at 438. We rejected that argument. Relying on Wolf, 443 U.S. 595, 99 S.Ct. 3020, we .held that the state tort claim was based on *544 neutral principles of law- that set a minimum standard of' bare, and that the case could be decided without undue entanglement. Odenthal, 649 N.W.2d at 438, 441.
Nothing in Odenthal hints that adjudicating a particular kind of state' tort claim is entangling per se. To the contrary, it requires that we analyze state tort claims on a claim-by-claim basis.[1]
Like Odenthal, this is a case based on neutral principles of state tort law. Like Odenthal, this case arises out of an activity considered part of a religious organization’s mission. Thus, there is no principled reason for the court to jettison the Odenthal framework and treat claims for defamation differently.
II.
Unquestionably, religious organizations have a constitutionally protected right to make decisions regarding their membership. Correctly, the Pfeils have not asked us to overturn their excommunication from St. Matthew Lutheran Church. Instead, they ask us to do as Odenthal requires: apply neutral principles of state defamation law, consider each allegedly defamatory statement, and, as to each, determine whether adjudication would excessively entangle us in religion.
Adjudicating certain kinds of allegedly defamatory statements would lead inevitably to entanglement... Examples of such statements are found in the Pfeils’ Second Amended- Complaint. The Pfeils plead that they were defamed when a minister said: “That Plaintiffs had publicly engaged in -‘sinful behavior’ ” inside and outside of the congregation. The Pfeils further plead that the minister defamed them with the words that the Pfeils had “refusfed] to follow the commands of God’s Word and Scriptural warnings by elected leaders of the congregation.” Obviously, we would be entangled excessively in religion if we tried to adjudicate what is “sinful behavior” or- whether someone refused to follow “the commands of God’s Word.”
But there are clear instances in which we can apply neutral principles of state defamation law to adjudicate defamation ' claims without excessive entanglement. Imagine a religious disciplinary proceeding in which a member has been charged with teaching false doctrine in the Sunday school. Plainly, we could not adjudicate any dispute regarding “false doctrine.” But, assume that, in response, the member says, maliciously and without a shred of truth: “The charge that I’m harming the Sunday school Is ironic, given that the minister regularly sexually, assaults the kids in the class.” As is true of many vicious, accusations, inevitably such a defamatory statement would spread like wildfire through the religious organization and into the community, causing great injury. Applying the Odenthal framework, a district court could íikely use neutral principles of state defamation law to adjudicate the minister’s defamation claim without excessive entanglement. • .
This is not to say that applying the test of excessive entanglement is always easy. There may be close cases when the analysis becomes, as the court puts it, “complicated and messy.” But I reject the court’s notion that the process of making a decision about excessive entanglement itself constitutes excessive entanglement. Such decisions are part of the judicial function, and we have made them as a matter of
*545 course. See, e.g., Wenthe, 839 N.W.2d at 90-92; Odenthal, 649 N.W.2d at 434-41. We should have done so here.
.'hi.
Instead, the court announces a categorical rule of law, closely akin to an absolute privilege to defame, thereby denying a state court remedy, for a state tort.. The court virtually inoculates speakers from liability for even their most outrageous false, malicious, and damaging statements that may have only a remote connection to any religious doctrine or mission.
Because this new privilege is not required by the United States Supreme Court’s - constitutional jurisprudence, it must be the product of judicial policy making. Historically, our policy has been that, because they deprive defamation victims of a remedy, absolute privileges should be rare creatures. “Absolute privilege is not lightly granted,” Zutz v. Nelson, 788 N.W.2d 58, 62 (Minn.2010), and is “confined within narrow. limits,” Matthis v. Kennedy, 243 Minn. 219, 223, 67 N.W.2d 413, 417 (1954). As we said in Zutz, we only extend absolute privilege “when public policy weighs strongly in favor of such extension.” 788 N.W.2d at 66 ’ (emphasis added).
Although religious freedom is, of course, a strong public policy, the. court does not demonstrate that the possibility of defamation liability “unduly interfere[s]” with that freedom. Nor does the court discuss why religious organizations cannot procure insurance to protect themselves from defamation liability.
On the other hahd, the cburt concedes that there is “merit” to concerns about injustice to defamation victims. It tries to limit the inoculation from liability it grants with a proviso: the rule of law applies only to statements made “during thp course of formal discipline proceedings” and “communicated only to other members of the church and participants:’” This proviso ignores the reality of how defamation can devastate its victims. Any statement made in a closed meeting of “members” and “participants” is unlikely to stay there. More, likely, a vicious falsity uttered in a small-town house of worship will be avidly republished, starting the very next morning during coffee at the Chatterbox Café.
A qualified privilege, rather than an absolute privilege, would strike a much better balance between a defamation victim’s right to a remedy and á religious organization’s right to discipline. Under Section 596 of the Restatement (Second) of Torts, a qualified privilege is available “for communications among [members of a religious organization] concerning the qualifications of the officers and members and their participation in the activities of the society.” Id. § 596 cmt.'e (1977). We have recognized a similar privilege for communications in the context of employment. See Lewis v. Equitable Life Assurance Soc’y of the U.S., 389 N.W.2d 876, 889-90 (Minn.1986); Stuempges v. Parke, Davis & Co., 297 N.W.2d 252, 256-57 (Minn.1980). A qualified privilege should have eased the court’s concerns:

IV.

Under the guise of avoiding a “complicated and messy” entanglement analysis, the court’s rule of law creates its own set of complications. The opinion -creates a liability-free zone, but does not properly mark and fence - the boundaries. As a result, -the zone is both over-inclusive and under-inclusive. ....
’ First, the court does not explain precisely which claimants, besides the Pfeils, lose their defamation remedy. A defamatory statement during a religious disciplinary proceeding might be heard by only mem *546 bers-and participants, but might.be about a non-member third party. I suspect that, under the court’s rule of law announced today, third-party victims would not have a state court remedy. But this is not clear.
Second, the court does not tell us what it means by “membership” and “formal church disciplinary proceedings.” Religious organizations’ understandings of “membership” and “formal disciplinary proceedings” vary widely. Some religious organizations have clearly defined indicia of what it means to belong; others do not. Some organizations have rules-based governance; others revolve around the thoughts of a single charismatic leader. Some organizations have complicated adjudicatory systems with several levels of appeal; others have nothing of the sort. By using words such as “formal” and “membership,” the opinion sends us into more religious tangles than it avoids.
Finally, it is-difficult to discern why the court’s categorical rule of law insulating religious actors from defamation claims would not extend to and insulate those actors from liability for other torts. The court’s opinion necessarily raises the question of whether the state judiciary, can adjudicate other state tort claims allegedly committed in connection with religious discipline, such as battery, fraud, false imprisonment, and negligent counseling.
V.
Had the court applied the Odenthal framework, it would have held that it could use neutral principles of law: Minnesota’s law of defamation. Then it would have analyzed the allegedly defamatory statements, one by one, to determine whether each could be resolved without excessive entanglement. Had it- done so, it would have concluded that adjudicating most of the statements would be entangling. It also would have concluded that most were not actionable because they were matters of opinion.[2] See, e.g., McKee v. Laurion, 825 N.W.2d 725, 738 (Minn.2013) (calling a physician a “real tool” is an opinion that cannot be the basis for a defamation action).
One statement, though, appears to be capable of adjudication without excessive entanglement. Paragraph 12 of the Second Amended Complaint alleges that a minister stated that the Pfeils had “accused [him] of stealing money from” St. Matthew Lutheran Church. The Pfeils allege that they made no such accusation. In other words, they contend that the minister falsely accused them of making a false accusation of the crime of theft.
Whether or not the Pfeils accused the minister of theft has little to do with the underlying disciplinary proceeding. I see no reason why a court and jury could not apply neutral principles of law without entanglement to determine whether: (1) the minister made the alleged statement; (2) it was false; (3) it was damaging to reputation; and (4) it was not protected by a qualified privilege. See Stuempges, 297 N.W.2d at 255-57.
Therefore, the court should have reversed the court of appeals and remanded the ease to the district court to apply the Odenthal framework on a - statement-by-statement basis. Any surviving defamation and negligence claims would then be subject to all available defenses, including qualified privilege.
*547 For all of these reasons, I respectfully dissent.

. As the opinion of the court demonstrates at footnotes 8 and 9, the majority of state supreme courts that have considered defamation claims arising out of religious disci-plinaiy proceedings have applied the ecclesiastical abstention doctrine on a claim-by-claim basis, rather than as a categorical bar.

. E.g., "That Plaintiffs had 'refused to show respect' towards servants of God and St. Matthew Lutheran Church leadership,” and "That .., Plaintiffs 'openly and intentionally attempted to discredit the integrity of the pastors and church leaders.' ” On their face, these are matters’ of opinion. '