**STATE of Minnesota, Plaintiff,**

v.

**Seth James VICTORSEN, Defendant.**

No. C7–00–1795.

Court of Appeals of Minnesota.

April 18, 2001.

James M. Ventura, Lambert & Boeder, Wayzata, MN, (for appellant).

David K. Ross, Carson, Clelland & Schreder, Minneapolis, MN, (for respondent).

Considered and decided by
KLAPHAKE, Presiding Judge,
AMUNDSON, Judge, and HUSPENI,*
Judge.

## OPINION

AMUNDSON, Judge

The appellant, in a DWI prosecution, moved the court to apply collateral estoppel because the court, in an earlier hearing on the related implied consent matter, found the stop not supported by articulable suspicion. The DWI court denied the motion, and ruled that the stop was proper and supported by articulable suspicion. The DWI court also ruled that the failure of police to videotape the stop did not require suppression but entitled the driver to an adverse-inference instruction. The DWI court certified questions to this court on the effect of the prior implied consent ruling, the legality of the stop, and the appropriateness of an adverse-inference instruction.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

At approximately 1:30 a.m. on August 22, 1999, Officer John Keding was dispatched to the site of a hit-and-run accident. The police dispatcher said a caller had complained that a red Jeep with a black top had driven across his lawn, struck a tree, and then struck a vehicle parked in his driveway. The dispatcher also received and relayed a second call about a "red/black vehicle speeding through the area."

Officer Keding approached the scene soon after he received the dispatcher's call. Keding saw a vehicle stopped, on the wrong side of the road, in front of the accident scene. Although he could not immediately identify the vehicle type, the vehicle passed him as he approached and he identified it as a blue truck. At the scene, Keding viewed the damage and tire tracks in the lawn. The dispatcher then radioed that a blue truck had been observed stopped in front of the accident scene. Keding then pursued the blue truck and stopped it approximately one block away from the accident scene. After Keding began to pursue the blue truck, the dispatcher informed him that the red Jeep had left its front bumper, including the license plate, at the accident scene.

Consequently, Seth Victorsen, the driver of the blue truck, had his license revoked pursuant to Minnesota's implied consent law. Victorsen filed a petition for judicial review of the revocation, alleging that the stop was illegal. Shortly thereafter, the State of Minnesota issued a criminal complaint for DWI and other charges. At a pretrial conference on the criminal matter, the prosecutor was verbally advised that the implied consent hearing was to be held five days later.

At the implied consent hearing, which was not attended by the DWI prosecutor, the police reports and dispatch log were accepted into evidence. Keding's report indicated that he made the stop because he "had received information as [he] arrived on the scene that the blue Ford pickup was stopped in front of the address where the damage occurred." Keding testified that, while two blocks away, he observed the blue pickup stopped, on the wrong side of the road, at the accident scene. He also testified that, after learning that the bumper and license plate had been left behind, he thought the driver of the blue truck might have returned to the accident scene to retrieve the items left by the red truck.

Keding also testified that, after stopping the blue truck, he identified the driver as Victorsen, and observed several indicia of intoxication including bloodshot and watery eyes, loquaciousness, slurred speech, the strong smell of alcohol, and difficulties with manual dexterity. He testified that, when asked, Victorsen denied stopping in front of the accident scene, but admitted to drinking. Keding then testified that Victorsen failed a preliminary breath test and a Horizontal Gaze Nystagmus test, and was subsequently arrested. The district court hearing the implied consent matter ruled that Keding lacked the requisite articulable suspicion to stop Victorsen's vehicle and rescinded the license revocation.

A hearing on pretrial motions in the DWI prosecution was held before a different district court judge almost three months after the implied consent hearing. Victorsen moved the court to apply collateral estoppel to exclude all evidence obtained as a result of the stop. The parties briefed both the issue of collateral estoppel and the issue of the legality of the stop. The DWI court denied the motion to apply estoppel, denied the motion to suppress evidence resulting from the stop, and, on the same record that was before the implied consent court, ruled that the stop

was supported by an adequate articulable suspicion.

The district court then certified four questions to the court of appeals:

(1) What effect, if any, should a ruling in [the implied consent] hearing have in a later hearing [in the factually related DWI prosecution] on the same issue?

\* \* \* \*

(2) On the record of the present case, \* \* \* was the stop of the defendant supported by an adequate articulable suspicion?

\* \* \* \*

(3) Should evidence of the encounter between the officer and the defendant be suppressed where, as here, the officer was equipped to record the encounter, and strongly advised if not fully required to do so by the policies of his department as set forth in the department's manual, but chose not to do so?

\* \* \* \*

(4) Is the defendant entitled to a jury instruction that the officer's failure to record the encounter [under these circumstances] weighs against the credibility of the officer's testimony concerning the events that could have been but were not recorded?

## ISSUES

I. Should a district court's determination, in an implied consent hearing, that there was no legal basis for a police stop, estop a prosecutor from litigating the identical issue involving the same evidence in a criminal prosecution?

II. Does an officer have a sufficient articulable suspicion to support the stop of a vehicle the officer observes stopped on the wrong side of the road at a fresh hit-and-run accident scene, which the officer knows contains potentially incriminating

evidence relevant to the hit-and-run accident?

III. When an initial, non-custodial, encounter between an officer and a driver is not recorded, is the driver entitled to suppression of evidence from that encounter or to an adverse-inference instruction if the recording is "strongly urged" by the officer's police department?

## ANALYSIS

### I.

The DWI court ruled that the implied consent court's determination regarding the legality of the stop had no collateral estoppel effect in the criminal proceedings because the parties were not the same or in privity with one another. This question is a pure question of law, which we review de novo. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358 N.W.2d 639 (Minn.1984).

■ Collateral estoppel is appropriate where: (1) the issue is identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue. *Willems v. Commissioner of Pub. Safety*, 333 N.W.2d 619, 621 (Minn.1983). The only elements at issue here are whether the State of Minnesota is in privity with the Commissioner of Public Safety, and whether the State of Minnesota was given a full and fair opportunity to be heard in the implied consent proceeding.

### *Privity*

■ Because there is no prevailing definition of privity that is applied automatically, the distinctive facts of each case must be carefully examined. *Margo–Kraft Distribs., Inc. v. Minneapolis Gas Co.*, 294

Minn. 274, 278, 200 N.W.2d 45, 47 (1972). Non-parties may be deemed to be in privity if they are connected with the action to the extent that they are "affected by the judgment with reference to interests involved in the action as if they were parties." *Id.* Parties in privity with those involved in the earlier action include those whose "interests are represented by a party to the action," *Denzer v. Frisch*, 430 N.W.2d 471, 473 (Minn.App.1988) (citing *Margo–Kraft*, 294 Minn. at 278, 200 N.W.2d at 47–48), sufficiently enough so that "the application of collateral estoppel is not inequitable." *Reil v. Benjamin*, 584 N.W.2d 442, 445 (Minn.App.1998), *review denied* (Minn. Nov. 17, 1998) (citing *Brunsoman v. Seltz*, 414 N.W.2d 547, 550 (Minn.App.1987), *review denied* (Minn. Jan. 15, 1988)).

In this case, a city attorney represented the State of Minnesota in the criminal DWI prosecution. In the implied consent hearing, the attorney general represented the Commissioner of Public Safety. Sixteen-years ago, in *State v. Juarez*, we determined, in a similar context, that the State of Minnesota was not in privity with the Commissioner of Public Safety. *State v. Juarez*, 345 N.W.2d 801, 803 (Minn.App. 1984), *review denied* (Minn. July 16, 1984). Although Victorsen suggests that *Juarez* is fact-based and can be distinguished, the facts are not materially different. Accordingly, the continuing vitality of *Juarez* is placed squarely before this court.

Our courts have long held that the implied consent statute is not criminal in nature. *State v. Nelson*, 608 N.W.2d 913, 915 (Minn.App.2000), *review denied* (Minn. June 27, 2000). In *Juarez*, we extended that general principle in determining that the parties who prosecute DWIs (city and county attorneys) were not "in privity" with those who litigate implied consent matters (the attorney general's office).

345 N.W.2d at 803 (quoting *State, Dep't of Pub. Safety v. Mulvihill*, 303 Minn. 361, 368, 227 N.W.2d 813, 817–18 (1975)).

■ But the lack of privity is not established merely by demonstrating that implied consent proceedings are civil in nature. In the years since the decision in *Juarez*, the legal landscape from which we view the narrow question of privity between these parties has been transformed. *Juarez*, emphasizing the "essential differences" between the two proceedings, concluded that the parties were not in privity. 345 N.W.2d at 803 (quoting *Mulvihill*, 303 Minn. at 368, 227 N.W.2d at 817–818). But over time, these differences have blurred considerably in ways most closely bearing on the question of privity. Penalty enhancements are now available to criminal prosecutors by virtue of license revocations pursuant to the implied consent statute. *See, e.g.,* Minn.Stat. §§ 169A.25, .26 (elevating severity of DWI offenses to a gross misdemeanor if the offender had a prior license revocation within the past ten years), .275 (increasing the mandatory penalties for each prior license revocation within a ten-year period), .28 (providing for mandatory consecutive sentences if the person has prior license revocations), .31 (2000) (elevating severity of alcohol-related bus driving offenses to a gross misdemeanor if the offender had a prior license revocation within the past ten years). Therefore, when defending a license revocation, the actions of the Commissioner of Public Safety now affect the potential criminal penalties available to the state. Similarly, prior impaired driving convictions serve the commissioner's interests by lengthening the duration of administrative license revocations. *See, e.g.,* Minn. Stat §§ 169A.52, subd. 4, .54, subd. 1 (2000) (increasing duration of administrative license revocations with prior license revocation). The relationship between

these parties is symbiotic, and the differences in their interests, as articulated in *Juarez*, have become a fictional construct.

Moreover, the effect of *Juarez* has been the institutionalization of a process whereby duplicative proceedings are frequent with inconsistent outcomes a distinct possibility. Drivers may challenge the legality of traffic stops at both implied consent hearings and at pretrial hearings in criminal matters. These parallel proceedings involve the same substantive law, elements of proof, standard of proof, burden of proof, and, often, the same evidence as well.[1] This unnecessary duplication of hearings is contrary to the rules of criminal procedure, which are intended to provide for the "just, speedy determination of criminal proceedings." Minn. R.Crim. P.

1.02. Furthermore, does not justice presume the consistent application of the law? The potential for inconsistency, realized in this case, is among the most objectionable results of the present system. Multiple hearings on the same record and for the determination of the same question unnecessarily burden the parties and provide no justifiable benefit.

Considering both that these problems have emerged and that any differences in the interests of the government parties have been muted by subsequent legislative action, *Juarez* can no longer control analysis of the collateral estoppel effect of a prior determination of an issue in a subsequent criminal proceeding.[2] Therefore, the Commissioner of Public Safety, in an implied consent proceeding,

---

1. We recognize that, under the current scheme, implied consent hearings and criminal pretrial hearings do not always involve the same evidence. For example, drivers in civil implied consent proceedings may assert the privilege against self-incrimination if it can be reasonably apprehended that the statements could be used against them in a criminal prosecution. *Nordvick v. Commissioner of Pub. Safety*, 610 N.W.2d 659, 662 (Minn.App. 2000) (citing *Heddan v. Dirkswager*, 336 N.W.2d 54, 63 (Minn.1983) (citation omitted)). But in a criminal pretrial hearing, this privilege is not available because the defendant does not waive the constitutional right against self-incrimination by testifying. *Simmons v. United States*, 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968); *State ex. rel. Rasmussen v. Tahash*, 272 Minn. 539, 554, 141 N.W.2d 3, 14 (1965). Therefore, even if the estopped party, the facts and the issue remain the same, this difference in evidentiary rules might prevent a defendant from receiving a full and fair opportunity to be heard on the adjudicated issue. For that reason, we decline to determine today whether a criminal defendant may be collaterally estopped from challenging the legality of a stop when, in a prior implied consent hearing, the court determined that it was legal.

2. Although this court, in 1989, re-affirmed that the state and the Commissioner of Public Safety were not in privity. *See Kirsch v. Com-*

*missioner of Pub. Safety*, 440 N.W.2d 147, 150 (Minn.App.1989), the confluence of these parties' interests discussed herein has occurred since that decision. *See, e.g.,* 1992 Minn. Laws ch. 570, art. 1, § 7 (including, for the first time, implied consent license revocations within the definition of a "prior license revocation," the existence of which elevates certain crimes to gross misdemeanor status). We recognize that our conclusion here is a departure from a settled legal principal. Although stare decisis dictates that we should not lightly overrule this court's prior decisions, this rule is not inflexible. *Johnson v. Chicago Burlington & Quincy R.R. Co.*, 243 Minn. 58, 68, 66 N.W.2d 763, 770 (1954). Where the reasons underlying a particular rule have ceased to exist or where the rule no longer conforms to the changed conditions of society, we do not "blindly adhere to former decisions even though legally sound when the case was decided." *Id.* at 69, 66 N.W.2d at 771. In light of changes in the relevant statutes, we decline to exercise our discretion to apply stare decisis in the present case. *See Naftalin v. King*, 257 Minn. 498, 500, 102 N.W.2d 301, 302 (1960) ("Whether or not the rule of stare decisis should be followed is a question entirely within the discretion of the court which is again called upon to consider a question once decided.").

is a privy of the State of Minnesota in a factually related DWI prosecution. As such, this conclusion now requires consideration of whether the State of Minnesota was afforded a full and fair opportunity to be heard in the implied consent proceeding.

*Full and Fair Opportunity to Be Heard*

The fourth and final element of collateral estoppel is that the party to be estopped "was given a full and fair opportunity to be heard on the adjudicated issue." *Willems,* 333 N.W.2d at 621. Here, the prosecutor was orally informed of the date and time of the upcoming implied consent hearing. Though the prosecutor was afforded an opportunity to attend the implied consent hearing, did this notice provide a full and fair opportunity for the prosecutor to be heard on the matter?

 The rationale underlying this element is fairness to the party against which preclusion is to be asserted. *In re Miller,* 153 B.R. 269, 274 (Bankr.D.Minn. 1993). In this case, the application of collateral estoppel would be unfair. When the prosecutor was informed of the implied consent hearing, the law on this matter clearly indicated the state was not estopped by adverse decisions in implied consent hearings. *See Juarez,* 345 N.W.2d at 801, 803 (holding that the State of Minnesota is not in privity with the Commissioner of Public Safety). The prosecutor had a right to rely on this rule of law. *See Spanel v. Mounds View Sch. Dist. No. 621,* 264 Minn. 279, 294, 118 N.W.2d 795,

804 (1962) (contemporaneous application of new rule of law "would work an even greater injustice" because defendants would be denied a defense "on which they have had a right to rely"). Accordingly, the mere invitation to attend the hearing did not provide the prosecutor a "full and fair opportunity to be heard" at the implied consent hearing, and therefore estoppel cannot apply in this case.[3]

 This is not to say that this result will always follow. Because the Commissioner of Public Safety and the State of Minnesota are in privity, if a prosecutor is given notice and an opportunity to participate in a hearing, that prosecutor, at a later hearing, will be estopped from opposing the binding effect of an order resulting from the earlier hearing.[4]

Having conditioned collateral estoppel upon notice and an opportunity to be heard, it is apparent that questions will arise how and when notice is to be given to the State of Minnesota, and by whom. We purposely do not mandate procedures. Though the efficient administration of scheduling matters will best be facilitated by the adoption of new procedures to notify the parties involved, specific direction to court administrators is unnecessary and improper. *Cf. State v. Gilmartin,* 535 N.W.2d 650, 653 (Minn.App.1995) (declining to exercise supervisory powers reserved to state supreme court). As exemplified by the present case, notice can be achieved by means other than the involvement of the court administrators. Notice may be given through procedures a court

---

3. Nor shall estoppel apply in criminal cases initiated prior to the date of this opinion. In deciding to apply this rule prospectively, we have considered its purpose, the extent of the reliance by law enforcement authorities on the old rule, and the effect of retroactive application on the administration of justice. *See State v. Olsen,* 258 N.W.2d 898, 907 n. 15

(Minn.1977) (articulating the balancing formula for prospective application of a new procedural rule).

4. As the question is not now before the court, we decline to address the question of whether collateral estoppel can be applied against the commissioner of public safety.

administrator chooses to create; notice may also be given by a driver when the implied consent hearing is scheduled. We do not intend to limit in this opinion the means by which proper notice and an opportunity to be heard may be given. We rule only that when proper notice and opportunity is given, the State of Minnesota shall be collaterally estopped from relitigating the issues decided in the implied consent proceeding.

## II.

▮ Victorsen also challenges the legality of the stop. When reviewing a district court determination on the legality of a limited investigatory stop, findings of fact are reviewed for clear error after giving due weight to the inferences that the court drew from those facts, and questions of reasonable suspicion are reviewed de novo. *State v. Britton,* 604 N.W.2d 84, 87 (Minn.2000).

▮ A stop is lawful if it is "based upon reasonable and articulable suspicion of ongoing criminal activity." *Id.* at 89. Police are allowed to conduct limited stops to investigate suspected criminal activity if they can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity, *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), and the officer must be able to point to something objectively supporting that suspicion. *Britton,* 604 N.W.2d at 87. In making this determination, we review the events surrounding the stop and consider the totality of the circumstances in deter-

mining whether the police had a reasonable basis for the stop. *Id.*

▮ Victorsen argues the stop was invalid because, citing *Britton,* he asserts that observation of activity that may be associated with criminal activity is an inadequate basis for a stop when that activity may also be associated with lawful activity. See *id.* at 88–89. But Victorsen overstates the holding of that case. In *Britton,* the supreme court held that a police officer's observation of a car with a broken window did not support a stop because a broken window, by itself, does not indicate illegal activity. *Id.* at 88. Although the officer testified that breaking a window was a common means to steal vehicles, and that he had personally been involved in the recovery of 10 to 20 stolen cars with broken windows, *id.* at 86, the supreme court discounted this testimony, observing that, because "broken windows are a fact of urban life," there were many possible explanations for a broken window, other than that the driver was a thief. *Id.* at 88. For that reason, the court concluded that a broken window could not be the sole basis for a stop. *Id.* Victorsen argues that the present case is similar in that an officer with Officer Keding's suspicions would be allowed to stop any individual driving by an accident scene. This conclusion is in error.

The officer testified that he observed Victorsen's vehicle on the wrong side of the road. That, in itself, constitutes a violation, Minn.Stat. § 169.18, subd. 1 (mandating that cars generally be driven on the right half of roadways), and may provide a basis for the stop. *See State v. Fiebke,* 554 N.W.2d 755, 756–57 (Minn. App.1996) ("As a general matter, the decision to stop an automobile is reasonable when the police observe a traffic violation.").

■ Furthermore, Victorsen misstates or ignores several important facts that distinguish this case from *Britton*. Officers can properly act on suspicion that would elude an untrained eye and due deference is accorded their training and experience. *Britton*, 604 N.W.2d at 89 (citing *State by Beaulieu v. City of Mounds View*, 518 N.W.2d 567, 569–70 (Minn.1994)). Officer Keding received a call indicating that a blue truck was stopped in front of the accident scene, not merely driving by. Keding also knew that the crime scene was fresh. Finally, Keding was informed that the bumper and license plate of the red Jeep had been left at the crime scene. Given these facts, it was reasonable for the officer to conclude that the occupants of the blue truck may have returned to the crime scene to remove evidence that might reveal that they, or others associated with them, had been involved in the commission of a crime. Fundamentally, there is a substantial difference between the permissible inferences to be drawn from the facts here and those that flowed from the facts before the officer in *Britton*. The absurd conclusion of extending the rationale of the officer in *Britton* is that *any* car driving *anywhere* could be stopped so long as it had a broken window. Officer Keding's rationale poses no such danger as it subjects few cars to being stopped: those that stop, at 1:30 a.m., on the wrong side of the road at a fresh crime scene, where critical evidence reportedly remains.

### III.

■ Victorsen argues that evidence of his encounter with Officer Keding should be suppressed because no video recording was made despite the fact that Keding's vehicle was equipped to make such a recording and that his police department's policy "strongly urged" such recordings in these situations. The supreme court has directed that all custodial interrogations shall be electronically recorded where feasible, and must be recorded when questioning occurs at a place of detention. *State v. Scales*, 518 N.W.2d 587, 592 (Minn. 1994). The district court declined to suppress evidence of the encounter between the officer and Victorsen, but indicated that it would instruct the jury that the officer's failure to record the encounter weighs against the credibility of his testimony.

■ Officer Keding did not record the traffic stop, his identification of Victorsen, his observations of Victorsen or the field sobriety test, despite having the ability to do so. But the *Scales* recording requirement does not apply to these events because these events were not custodial. *See Umphlett v. Commissioner of Public Safety*, 533 N.W.2d 636, 640 (Minn.App.1995) (holding that actions prior to the implied consent advisory are "non-custodial"), *review denied* (Minn. Aug. 30, 1995). The fact that the police department "strongly urged" the recording of these events has no bearing on whether or not they were custodial.

In its report of certified questions, the court cited *State v. Logan*, 535 N.W.2d 320 (Minn.1995), as supporting its decision to grant a remedial jury instruction. But *Logan* also involved the failure to record a custodial interrogation, and not the non-custodial activity present here. *Id.* at 325. Although trial courts are allowed "considerable latitude" in selecting jury instructions, the district court's reliance on *Logan* was misplaced. *See State v. Gray*, 456 N.W.2d 251, 258 (Minn.1990) (noting the district court's discretion in selecting jury instructions) (quoting *Alholm v. Wilt*, 394 N.W.2d 488, 490 (Minn.1986)).

### DECISION

The DWI court properly determined that the prosecutor was not collaterally

estopped from arguing that the stop was supported by reasonable articulable suspicion, even though (a) this issue had been decided in the driver's favor during an implied consent proceeding, and (b) privity exists between the prosecutor and the attorney general's office, because the prosecutor did not have a fair and adequate opportunity to litigate the issue in the earlier proceeding. The district court also properly held that the stop was supported by reasonable articulable suspicion. While the district court did not err in declining to suppress evidence of defendant's intoxication pursuant to *State v. Scales*, 518 N.W.2d 587 (Minn.1994), the court's decision to grant a remedial instruction was not supported.

**Certified questions answered.**