Randall M. EGAN, Appellant,

v.

HAMLINE UNITED METHODIST
CHURCH, Respondent,

Kim S. Gruetzmacher, Defendant.

No. A03–675.

Court of Appeals of Minnesota.

April 13, 2004.

D. Clay Taylor, D. Clay Taylor, P.A., Minneapolis, MN, for appellant.

William M. Hart, Leatha G. Wolter, Melissa Dosick Riethof, Meagher & Geer, P.L.L.P., Minneapolis, MN, for respondent.

Considered and decided by
SHUMAKER, Presiding Judge;
KLAPHAKE, Judge; and MINGE, Judge.

## OPINION

MINGE, Judge.

Appellant, music director for respondent church, challenges the dismissal of his claims against the church as his employer for violations of the Minnesota Human Rights Act based on sexual orientation. Because we determine that the Minnesota Human Rights Act exempts religious staff of religious organizations from its protections against adverse employment action based on sexual orientation and because respondent has not clearly and unequivocally waived the exemption, we affirm.

## FACTS

Appellant Randall Egan served as music director for respondent Hamline United Methodist Church (Hamline Methodist) beginning in 1994. Egan was responsible for managing and rehearsing Hamline Methodist's choir, selecting and preparing music for regular Sunday services and other special services, playing the organ, and supervising other church music groups, such as the children's choir and the hand bell choir. Egan's sexual orientation is bisexual.

In 1999, Hamline Methodist committed itself to be a reconciling congregation. A reconciling congregation is one that openly welcomes gay, lesbian, and bisexual parishioners into its membership. The process of formally adopting this policy at Hamline Methodist began in 1992 and was protracted and contentious.

On the evening of May 16, 2000, Egan observed respondent Kim Gruetzmacher and the church's hand bell choir director, Marilyn Wahlstrom, engaged in a conversation in the church parking lot. Gruetz-

macher is a member of Hamline Methodist and of its hand bell choir. Egan approached the two because he simply wished to be sociable. Unbeknownst to Egan, Gruetzmacher and Wahlstrom were discussing the church's decision to identify itself as a reconciling congregation. After listening to Gruetzmacher express disagreement with the reconciliation policy and strong disapproval of homosexuals, Egan commented that he had not been aware that Gruetzmacher "was so homophobic."

The following day, Gruetzmacher sent a letter to Hamline Methodist's pastor expressing his disapproval of the congregation's reconciling policy decision and demanding an apology from Egan for referring to him as "homophobic." Egan was advised of the Gruetzmacher letter and ultimately told that unless he sent an acceptable letter of apology, he would be discharged. Egan responded that he could not in good conscience apologize for voicing support of Hamline Methodist's reconciling policy. Egan was then discharged.

On June 22, 2001, Egan filed a charge of discrimination with the Minnesota Department of Human Rights (MDHR), alleging discrimination and retaliation by Hamline Methodist on the basis of sexual orientation under the Minnesota Human Rights Act (MHRA). The MDHR dismissed Egan's claim, finding no probable cause to charge Hamline Methodist.

Egan then commenced this action alleging that Hamline Methodist's demand that he write a letter of apology and his subsequent discharge constituted discrimination and retaliation on the basis of his sexual orientation in violation of the MHRA.[1]

---

1. Egan also brought a claim against Gruetzmacher for tortious interference with his employment. Gruetzmacher sought to have this claim dismissed as having been initiated after the statute of limitations had run. The district court denied the motion to dismiss. Ap-

Hamline Methodist moved to dismiss Egan's claims on the ground that, as a church, it is not subject to the Act and that therefore the district court lacked subject matter jurisdiction. The district court granted Hamline Methodist's motion and this appeal followed.

## ISSUES

1. Does the Minnesota Human Rights Act require that sexual orientation be a bona fide qualification of employment in order for religious organizations to claim exemption?

2. Does the Minnesota Human Rights Act protect appellant as a church music director from discrimination and retaliation on the basis of sexual orientation?

3. Did the respondent church waive the exemption provided for in the Minnesota Human Rights Act for religious organizations with respect to employment discrimination on the basis of sexual orientation?

## ANALYSIS

■ This case presents statutory, jurisdictional, and constitutional questions. These are questions of law that we review de novo. *Kolton v. County of Anoka,* 645 N.W.2d 403, 407 (Minn.2002) (statutory interpretation); *Odenthal v. Minn. Conference of Seventh–Day Adventists,* 649 N.W.2d 426, 434 (Minn.2002) (subject matter jurisdiction). On appeal from the grant of a motion to dismiss under Minn. R. Civ. P. 12.02, this court accepts the factual allegations in the complaint as true, views them in the light most favorable to the appellant, and reviews the district court's legal conclusions de novo. *See Granville v. Minneapolis Pub. Sch., Special Sch. Dist. No. 1,* 668 N.W.2d 227, 229–30 (Minn.App.2003).

Egan brought his claims against Hamline Methodist alleging employment discrimination on the basis of sexual orientation in violation of Minn.Stat. § 363.03, subd. 1(2)(b) (2002), and retaliation in violation of Minn.Stat. § 363.03, subd. 7(1) (2002).[2] Although the MHRA generally prohibits discrimination on the basis of sexual orientation, there are two exceptions for religious associations. One provides:

> Nothing in this chapter prohibits any religious association ... from:
>
> ....
>
> (2) in matters relating to sexual orientation, taking any action with respect to ... employment.... This clause shall not apply to secular business activities [of the religious association] ... unrelated to the religious and educational purposes for which it is organized.

Minn.Stat. § 363A.26(2) (Supp.2003). Another provides that the anti-discrimination provisions of the MHRA do not apply to

> a religious ... association ... with respect to qualifications based on religion or sexual orientation, when religion or sexual orientation shall be a bona fide occupational qualification for employment.

Minn.Stat. § 363A.20, subd. 2 (Supp. 2003). In dismissing Egan's claims, the district court found that Hamline Methodist, as a church, was exempt under the MHRA from claims of discrimination and

pellant's claim against Gruetzmacher is not at issue in this appeal.

**2.** Although the statute is substantively the same, the MHRA was renumbered subsequent to the commencement of this action. Minn. Stat. § 363.03, subd. 1(2)(b) (2002) was re-numbered as Minn.Stat. § 363A.08, subd. 2(b) (Supp.2003). Minn.Stat. § 363.03, subd. 7(1) (2002) was renumbered as Minn.Stat. § 363A.15(1) (Supp.2003). For ease of reference, we cite the current version of the statute.

retaliation based on sexual orientation, that the limit on this exemption for secular employees did not apply to Egan as a music director, and that the differences between two provisions of the MHRA did not limit the exemption.[3]

## I.

■ The first issue is whether the exemption for churches in Minn.Stat. § 363A.20, subd. 2, conflicts with and limits the exemption in Minn.Stat. § 363A.26(2). Egan notes that Minn.Stat. § 363A.20, subd. 2, only exempts situations where sexual orientation is a bona fide occupational qualification in the hiring context. He claims that this is a narrow or specific exemption. By contrast, he characterizes Minn.Stat. § 363A.26(2), which exempts religious employers from the prohibition against discrimination on the basis of sexual orientation, as a broad or general exemption. Egan claims that because the overriding purpose of the MHRA is to prohibit discrimination, the narrower exemption should be read as limiting the more broadly worded exemption. This interpretation would limit the exemption to situations where the complaining employee's sexual orientation or religion had been a bona fide occupational qualification. Because sexual orientation is not often a clear occupational qualification, Egan's reading of the law would substantially constrict the reach of the exemption in Minn.Stat. § 363A.26(2).

Egan has identified an apparent anomaly in the statutory exemptions for religious organizations in the MHRA. The two provisions are not congruent. Egan is correct in pointing out that when general statutory provisions conflict with specific provisions, the specific provisions prevail. *See* Minn. Stat. § 645.26, subd. 1 (2002). However, we do not agree that the bona fide occupational qualification is necessarily the more specific rule, or even if it is, that it should be transported into or prevail over Minn. Stat. § 363A.26(2). Minn. Stat § 363A.20, subd. 2, can be read as only applying to hiring situations. The legislature may craft a narrower exemption for hiring and a broader exemption for religious organizations when it comes to sexual orientation and employment more generally. As so read, there is not an irreconcilable statutory conflict between these provisions that would bar Hamline Methodist from claiming the exemption of Minn.Stat. § 363A.26(2). *See* Minn.Stat. § 645.16 (2002) ("Every law shall be construed, if possible, to give effect to all its provisions."). We adopt this construction of the law and decline to limit the exemption in Minn.Stat. § 363A.26(2), as urged by Egan.

## II.

■ The second issue is whether the district court erred in concluding as a matter of law that Egan, as a church employee, was exempt from MHRA protection. Egan argues that because the district court is required to accept each allegation in his complaint as true when resisting a motion to dismiss, and because the complaint alleges that the position of "music director" was secular, the district court erred. We agree with Egan that in a motion to dismiss, the district court must assume the facts as presented by the party

---

**3.** Hamline Methodist does not concede that it discriminated against Egan on the basis of sexual orientation. Instead, for purposes of its motion, Hamline Methodist argues that even if it had discriminated on such a basis, Egan is barred from bringing suit under the MHRA. Thus, for the purposes of this appeal, we assume the facts alleged in Egan's complaints to be true and that the adverse acts by Hamline Methodist against Egan were solely based on his sexual orientation.

opposing the dismissal effort. *See Granville*, 668 N.W.2d at 229–30. Thus, unless the facts as alleged in the complaint establish that the position of music director is religious, the district court is obliged to accept the secular characterization for the purposes of deciding the motion to dismiss.

The MHRA defines a secular activity as one "which is unrelated to the religious and educational purposes for which [the religious association] is organized." Minn. Stat. § 363A.26(2). Minnesota has no caselaw that further defines who is a secular employee of a religious organization or that classifies a church music director as a religious, as opposed to a secular, position. But, "Title VII cases [under the federal Equal Employment Opportunity Act] are instructive and may be applied when interpreting the [MHRA]." *Fahey v. Avnet, Inc.*, 525 N.W.2d 568, 572 (Minn.App.1994), *review denied* (Minn. Feb. 14, 1995).

■ Several decisions from other jurisdictions have addressed the problem of classifying church staff in the context of Title VII claims. Under the so-called "ministerial exception," employment relationships between religious associations and their "ministerial staff" are exempt from the requirements of Title VII. *See Assemany v. Archdiocese of Detroit*, 173 Mich.App. 752, 434 N.W.2d 233, 237 (1988). Whether an employee is covered by the ministerial exception or is secular depends upon "the function of the position." *Id.* One need not be an actual ordained minister to fall within this exception. *Starkman v. Evans*, 198 F.3d 173, 176 (5th Cir.1999).

■ In *Starkman*, the Fifth Circuit denied a church music director's claims of discrimination and retaliation, finding that the position fell within the Title VII ministerial exception. *Id.* at 177. That court developed a test that examined "the employment duties and requirements of the employee as well as her actual role at the

church." *Id.* at 175–76. Under the *Starkman* test, the court first asks whether the employment decision was based largely on religious criteria. *Id.* at 176. Second, the court determines whether the employee was qualified and authorized to perform the ceremonies of the church. *Id.* Finally, the court asks whether the employee engaged in activities traditionally considered ecclesiastical or religious, including whether the plaintiff attends to the religious needs of the faithful. *Id.* The Fifth Circuit noted that the third factor is considered most important in its analysis. *Id.* In large part, these questions revolve around whether the employee's duties consist of the propagation of religious faith or doctrine.

Using this analysis, other jurisdictions have found that the role of "music director" has a religious significance; it is not a secular role. *See EEOC v. Roman Catholic Diocese*, 213 F.3d 795, 802–03 (4th Cir.2000) (holding that a music director's gender discrimination claim under Title VII was barred under the ministerial exception and noting "music is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred."); *Starkman*, 198 F.3d at 175–76 (determining that a music director's claims fell within the ministerial exception because the plaintiff's employment duties and requirements, as well as plaintiff's actual role at the church, were traditionally ecclesiastical or religious); *Miller v. Bay View United Methodist Church, Inc.*, 141 F.Supp.2d 1174, 1183 (E.D.Wis.2001) (holding that a church music director's discrimination claims were barred by the ministerial exception because plaintiff "engaged in traditionally ecclesiastical or religious activities").

Egan's work at Hamline Methodist, as alleged by Egan himself, must be analyzed to determine whether his position as music

director is secular. In his complaint, Egan describes his work for Hamline Methodist as including

building and maintaining choir membership; selecting and preparing music for Sunday services and other special services throughout the church year; rehearsing the choir; playing the organ for services, weddings, and funerals; arranging for visiting musicians to participate in church services and special events, supervising the directors of [Hamline Methodist's] special musical groups (such as the children's choir or the hand bell choir).

We acknowledge that the three-part *Starkman* test is not easily applied to this job description. It is not clear that the initial decision to hire a music director is based on religious criteria or that music directors are qualified to perform religious ceremonies. But we note that the federal Title VII test is more demanding than the Minnesota statutory test. The Minnesota law asks whether Egan's work as a music director is "[]related to the religious and educational purposes for which [Hamline Methodist] is organized." *See* Minn.Stat. § 363A.26(2). We recognize that music generally has a central and substantial role in expressing religious faith; it is often described as a "ministry of music." Music addresses the religious needs of church members and plays an integral part of the worship program. Egan states that his responsibilities include "selecting and preparing" music for religious services. Clearly, Egan had to be familiar with the corpus of church music and theology to select the proper music for such services. In performing this task, he is expected to consider the time in the church year, the scripture readings, the sermon topic, the church's basic faith principles, and other religious matters. That Title VII cases have considered music directors exempt from the protections of that act argues in favor of our concluding that a music director plays a religious role for MHRA purposes. Accepting the facts alleged in Egan's complaint as true, we cannot say the district court erred in finding as a matter of law that Egan was a religious employee.

## III.

■ The third issue is whether statements contained in Hamline Methodist's *Personnel Handbook* and the United Methodist Church's *The Book of Discipline* waived Hamline Methodist's exemption from the MHRA. The *Personnel Handbook*, which sets forth Hamline Methodist's employment policies, provides

**Non-discrimination in Employment.** It is the policy of the Church to afford equal employment opportunity to qualified individuals regardless of their race, color, national origin, age, sex, marital status, sexual orientation, handicap status or welfare status and to conform to applicable laws and regulations. This policy of equal opportunity takes into account all aspects of employment relationship, including hiring, promotion, retirement, termination, training and compensation.

The doctrinal principles of the United Methodist Church are set forth in *The Book of Discipline*, which states:

**Human Rights Regardless of Sexual Orientation**—Certain basic human rights and civil liberties are due all persons. We are committed to supporting those rights and liberties for homosexual persons.

The question is whether these statements waive the statutory exemption of religious associations from the requirements of MHRA.

Although this is a case of first impression in Minnesota, the waiver issue, as it

relates to Title VII, has arisen in other jurisdictions. In *Hall v. Baptist Mem'l Health Care Corp.*, a plaintiff bringing a Title VII claim against a religious educational organization argued that the defendant waived its Title VII exemptions for such institutions because it represented itself as being an equal opportunity employer. 215 F.3d 618, 625 (6th Cir. 2000). The Sixth Circuit held that Title VII "exemptions reflect a decision by Congress that religious organizations [are to be] free from government intervention. Once Congress stated that this title shall not apply to religiously-motivated employment decisions by religious organizations, neither party could expand the statute's scope." *Id.* (quotation and citation omitted). In *Little v. Wuerl*, the Third Circuit stated that the appellant's waiver argument "incorrectly views the exemptions for religious [institutions] as a privilege or interest granted to those organizations. Instead, those exemptions reflect a decision by Congress that the government interest in eliminating religious discrimination by religious organizations is outweighed by the rights of those organizations to be free from government intervention." 929 F.2d 944, 951 (3rd Cir. 1991) (footnote omitted). *See also Siegel v. Truett–McConnell Coll., Inc.*, 13 F.Supp.2d 1335, 1345 (N.D.Ga.1994) (holding that a religious college could not waive its exemption under Title VII).

Egan most heavily relies on *Welter v. Seton Hall Univ.*, where the New Jersey Supreme Court held that the First Amendment did not bar the plaintiff's claims against a church-affiliated college for breach of contract where the employment contract did not raise questions of religious doctrine. 128 N.J. 279, 608 A.2d 206, 216 (1992). In that case, there was an express contract. *Id.* at 209. The New Jersey court noted that it could review the college's employment manual to determine whether religious doctrine or policies precluded consideration of the employment dispute. *Id.* at 214. Although this raises the specter of entanglement, our case is different. Egan's claims are based on the legislative policy as expressed in the MHRA and not solely on an allegation of breach of contract.

Egan points to other contexts in which Minnesota has permitted a waiver. *See Holmquist v. State*, 425 N.W.2d 230, 231 (Minn.1988) (addressing waiver of governmental immunity provided for in the State Tort Claims Act); *Duluth Lumber & Plywood Co. v. Delta Dev., Inc.*, 281 N.W.2d 377, 383–84 (Minn.1979) (examining whether sovereign immunity was waived by the governing body of an Indian reservation by virtue of a "sue and be sued" clause contained in its housing ordinance); *State ex rel. Shetsky v. Utecht*, 228 Minn. 44, 50, 36 N.W.2d 126, 129 (1949) (holding that the voluntary absence of a criminal defendant from court proceedings amounted to a waiver of his statutory and constitutional rights to be present at the rendition of the verdict). We note that two of these settings involve an immunity doctrine that had created harsh, long criticized results. The third example is also not persuasive because waivers of constitutional rights in criminal proceedings are strictly scrutinized.

■  The question we face is whether we will follow the rule against waivers developed in federal Title VII cases. Egan asserts that the judicial reluctance to recognize waivers accords religious groups a privileged position and thus violates the Establishment Clause of the First Amendment to the United States Constitution. In reaching our decision, we note the reluctance of courts to become involved in the affairs of churches. [A] state action [challenged under the First Amendment]

must have a secular purpose, must neither inhibit nor advance religion in its primary effect, and must not foster excessive governmental entanglement with religion. *Odenthal,* 649 N.W.2d at 435 (discussing *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971)). At issue in this case is the doctrine of avoiding excessive entanglements under which a state may not inquire into or review the internal decision making or governance of a religious institution. *Id.* at 435.

In balancing the establishment, free exercise, and entanglement concepts in a constitution analysis of freedom of religion, courts generally recognize that churches may decide for themselves matters of church government as well as those of faith and doctrine. *Id.* (quoting *Presbyterian Church v. Hull Church,* 393 U.S. 440, 448, 89 S.Ct. 601, 605, 21 L.Ed.2d 658 (1969)). Only if civil courts can resolve the issues by neutral application of law and by applying rules or standards without particular regard to religious institutions, is the entanglement problem avoided. *Id.* at 435. For example, in *Black v. Snyder,* we held that the district court could consider Black's harassment claim against her church employer under the MHRA because the claim did not involve scrutiny of church doctrine or interfere in matters of an inherently ecclesiastical nature. 471 N.W.2d 715, 721 (Minn.App.1991), *review denied* (Minn. Aug. 29, 1991). But, at the same time, this court upheld the dismissal of Black's retaliation claim because the claim was fundamentally connected to issues of church doctrine and governance and would require court review of the church's motives for discharging Black. *Id.* at 720. This court has recently emphasized that [[a]ppointment and discharge] claims are fundamentally connected to issues of church doctrine and governance. *J.M. v. Minn. Dist. Council of Assemblies*

*of God,* 658 N.W.2d 589, 594 (Minn.App. 2003) (citing *Black,* 471 N.W.2d at 720).

We conclude that the constitutional policy of avoiding entanglement controls in this case. As much as the MHRA represents a legislative decision to protect individuals from discrimination based on sexual orientation, it also recognizes that entanglement with religious employees of religious associations is a very delicate problem. Avoiding such a conflict does more to prevent an entanglement problem than it establishes any preferred position for religious organizations or creates an establishment problem. Thus, we conclude that the district court did not err in rejecting Egan's claims that Hamline Methodist waived its exemption from the MHRA.

However, we would not take the rule from the Title VII cases to its logical extreme. We do not hold that it is impossible for churches to waive their exemption from the MHRA. If the waiver is specific and unequivocal, and if the scope of that waiver is evident, then there is not a risk of entanglement. It ought to be recognized. It would be illogical and unjust to ignore such a waiver; however, a pronouncement by the religious organization that it will conform to the principle of nondiscrimination only indicates an intent to voluntarily embrace that principle. Without greater clarity, we would be compelled to conduct an examination and interpret statements of Hamline Methodist and the United Methodist Church on doctrinal policy as it relates to the alleged reasons for an employee's discharge. This invites an unconstitutional entanglement of the church with the judicial and administrative branches of government. We conclude that there is not an effective waiver in this case.

In reaching our decision, we note that the debate over sexual orientation in reli-

gious bodies is highly contentious and the position of religious organizations on this subject may be revised from time-to-time. The legislature has decided to balance the prohibition against discrimination that deprives individuals of basic human dignity with a recognition of the importance of religious freedoms guaranteed in the First Amendment of the United States Constitution. The right to be free from discrimination and retaliation based on sexual orientation is provided by state statute. The legislature has authority to define the scope of the statutory protection. Embodied in the provisions of the MHRA is the legislature's recognition that the government interest in eliminating such discrimination is outweighed by the rights of religious associations to be free from government intervention in matters of doctrine and governance and in matters related to the sexual orientation of religious staff. The decision of Hamline Methodist to invoke its statutory right to be exempt from the requirements of the MHRA may make its commitment to nondiscrimination appear hollow. But, when faced with such conflicts, it is for the religious organization, not the government, to resolve possible inconsistencies between Hamline Methodist's policies in principle and its policies in practice. Absent a specific waiver, the legislature's decision not to intrude upon this process does not violate the Establishment Clause of the First Amendment and should be respected.

## DECISION

Because Minn.Stat. § 363A.20, subd. 2 and Minn.Stat. § 363A.26(2) of the MHRA are not in conflict, because Egan's employment duties are related to the religious purposes for which Hamline Methodist is organized, and because the church's statements of policy did not specifically waive its exemption from the Act, we affirm the district court's dismissal of Egan's claims.

**Affirmed.**