**John FR DOE, Appellant,**

v.

**LUTHERAN HIGH SCHOOL OF GREATER MINNEAPOLIS, Respondent,**

**Lutheran Church–Missouri Synod, Respondent.**

**No. A04–2335.**

Court of Appeals of Minnesota.

Aug. 23, 2005.

Jeffrey R. Anderson, Kathleen P. O'Connor, Jeff Anderson & Associates, P.A., St. Paul, MN, for appellant.

William M. Hart, Leatha G. Wolter, Melissa Dosick Riethof, Meagher & Geer, P.L.L.P., Minneapolis, MN, for respondent Lutheran High School of Greater Minneapolis.

Stephen O. Plunkett, Shanda K. Pearson, Rider Bennett, LLP, Minneapolis, MN, for respondent Lutheran Church–Missouri Synod.

Considered and decided by SCHUMACHER, Presiding Judge; WILLIS, Judge; and MINGE, Judge.

## OPINION

ROBERT H. SCHUMACHER, Judge.

Appellant John FR Doe challenges the district court's grant of summary judgment to respondents Lutheran High School of Greater Minneapolis and Lutheran Church–Missouri Synod on his discrimination claim that he was wrongfully discharged under the Minnesota Human Rights Act, Minn.Stat. § 363A.08, subd. 2(b) (2004), based on his sexual orientation. He argues that his claims are not prohibited under the First Amendment to the United States Constitution or the Freedom of Conscience Clause of the Minnesota Constitution and that the religious-association exemption in the Minnesota Human Rights Act, Minn.Stat. § 363A.26(2) (2004), does not apply. The synod argues in a notice of review that it is not Doe's employer within the meaning of the Minnesota Human Rights Act. We affirm.

## FACTS

The synod is a membership organization of Lutheran congregations and ministers. It is an advisory body rather than an ecclesiastical government. The synod may grant recognized-service-organization status to an organization. While such an organization remains independent, it "fosters the mission and ministry of the church, engages in program activity that is

in harmony with the programs of the boards of the Synod, and respects and does not act contrary to the doctrine and practice of the Synod." Lutheran High School is a recognized service organization of the synod. Dr. Lane Seitz is the district president of the Minnesota south district of the synod, in which the high school is located, and served as Does ecclesiastical supervisor.

In 1973, by resolution the synod recognized "homophile behavior 'intrinsically sinful.'" In 1999, it published a document outlining its ministerial goals of "repentance" and "abst[inence] from homosexual behavior" in "A Plan for Ministry to Homosexuals and Their Families." The plan notes that the "Scriptures are clear ... that homosexuality is the tragic result of original sin." Another document prepared by the synod in 1981 states that "[a]s a sinful human being the homosexual is held accountable to God for homosexual thoughts, words, and deeds."

The high school's faculty handbook states that the high school "is a sacred community which is administered according to the Christian understanding of the Gospel." The association bylaws state that the aim of the school is "to offer a sound Christian education" and that education is to "rest wholly and solely on the Word of God as contained in the Old and New Testaments of the Bible." The high school's bylaws require that, where possible, the faculty should be members of the synod. When the positions cannot be filled in that manner, they may be filled with other "Christian instructors." The bylaws state that "[n]o instructor shall be employed or retained who teaches anything contrary to the letter and spirit of the confessions, symbols, doctrines, practices or discipline prescribed by the doctrinal foundation."

The synod ordained Doe as a pastor in July 1976. He was initially called to serve as the high school's campus pastor from 1976 to 1979. After serving in other ministries, he was again called to be a campus pastor and teacher in 1993. A "call" is a calling to public ministry that is placed by a synod congregation or registered service organization to perform public ministry responsibilities. According to the synod's documents, the "Holy Spirit guides and directs the process of calling workers in His kingdom through people, on behalf of the calling entities, according to their constitutional process. Each step of the process will always include prayer that God's will be done and that the process and decisions be guided by the Holy Spirit."

Doe's position with the high school was that of a teacher and chair of the theology department, as well as a campus pastor at the high school. His responsibilities included classroom education, chapel oversight, and student counseling. As campus pastor, he supervised Holocaust education and diversity education, conducted chapel services, conducted and oversaw small prayer groups and meetings for the students, and had a pastoral-care office. Doe acknowledged that the high school follows religious beliefs and doctrinal statements of the synod and as campus pastor and theology teacher, he was responsible for ensuring that students and faculty followed those principles.

Doe, who was married and has two daughters, informed his family in spring 1998 that he identified as a gay man. At his wife's request, he then informed her family by letter of his sexual orientation. His wife's brother, who was employed by the synod as an administrative pastor, contacted his own bishop with this information, who then told Doe's bishop, Dr. Seitz. In spring 1999, Seitz contacted Doe, who acknowledged his identity as a gay man

and explained that he was not in a "gay relationship" and had never lived a "gay lifestyle."

In September 1999, Seitz and Doe met with the high school's then-principal, Randy Ash. The discussion focused on Doe remaining "closeted" and celibate and that he would continue to teach for another year because of the difficulty of finding a replacement. In January 2000, Doe met with Seitz again because the high school had an opportunity to call a new pastor to replace Doe. Doe then resigned. He did not tell any of his students of his sexual orientation.

Doe sued the high school and the synod for discrimination based on his sexual orientation. The district court granted summary judgment in favor of Lutheran High School and the synod. Doe appeals, and the synod filed a notice of review, contending it was not Does employer.

## ISSUES

1.  Would resolution of Doe's claim violate the First Amendment to the United States Constitution?

2.  Would resolution of Doe's claim violate the Freedom of Conscience Clause of the Minnesota Constitution?

3.  Is the Lutheran Church–Missouri Synod Doe's employer within the meaning of the Minnesota Human Rights Act, Minn.Stat. § 363A.03, subd. 16 (2004)?

4.  Does the religious association exemption in Minn.Stat. § 363A.26(2) (2004) apply?

## ANALYSIS

In reviewing summary judgment, we determine whether there are any genuine questions of material fact and whether the district court erred as a matter of law. *State by Cooper v. French*, 460 N.W.2d 2, 4

(Minn.1990). Issues of statutory interpretation are reviewed de novo. *Kolton v. County of Anoka*, 645 N.W.2d 403, 407 (Minn.2002). Issues of subject-matter jurisdiction are also reviewed de novo. *Odenthal v. Minn. Conference of Seventh–Day Adventists*, 649 N.W.2d 426, 434 (Minn.2002).

1.  Doe sued Lutheran High School and the synod for discrimination under the Minnesota Human Rights Act (MHRA), which prohibits discharge of an employee based on sexual orientation. Minn.Stat. § 363A.08, subd. 2(b) (2004).[1] For purposes of this summary judgment analysis, Doe's claim that he was discharged because he was forced to resign is not disputed. It also is undisputed that Doe was discharged based on his sexual orientation. The district court granted summary judgment on the MHRA claim, holding that resolving it would result in excessive entanglement between the church and state in violation of the First Amendment to the United States Constitution.

Doe argues that the First Amendment does not preclude a court's review of the discharge decision. The First Amendment provides in relevant part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. It applies to both legislative and judicial power. *Odenthal*, 649 N.W.2d at 435. The exercise of government authority is valid if (1) it has a secular purpose; (2) the primary effect is one that neither advances nor inhibits religion; and (3) it does not foster excessive entanglement between church and state. *Id.* citing *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971). It is undisputed that only the third prong is at issue here, namely, whether resolu-

1.  The MHRA was recodified in 2003.

tion of Doe's MHRA claim will result in excessive entanglement between church and state.

■■■ The "state may not inquire into or review the internal decisionmaking or governance of a religious institution." *Odenthal,* 649 N.W.2d at 435. Accordingly, a court could not review claims by a pastor related to her appointment and discharge under the MHRA because these were "fundamentally connected to issues of church doctrine and governance and would require court review of the church's motives" for discharge. *Black v. Snyder,* 471 N.W.2d 715, 720 (Minn.App.1991), *review denied* (Minn. Aug. 29, 1991). Similarly, a pastor's claims related to his appointment and discharge as a pastor were not reviewable because adjudication would require an evaluation of scripture, doctrine, and moral principles. *Singleton v. Christ the Servant Evangelical Lutheran Church,* 541 N.W.2d 606, 611–12 (Minn.App.1996), *review denied* (Minn. Mar. 19, 1996). In contrast, courts may address a claim against a church without excessive entanglement "when the dispute can be resolved according to 'neutral principles of law'—that is, by rules or standards that have been developed and are applied without particular regard to religious institutions or doctrines." *Odenthal,* 649 N.W.2d at 435.

Thus, the question here is whether analysis of Doe's discrimination claim will require inquiry into the internal decisionmaking of a religious institution, is fundamentally connected to issues of church doctrine and governance, or requires evaluation of scriptures and church doctrine, or whether it may be resolved by neutral principles of law.

■■■ Although Doe acknowledges that part of his job entailed pastoral duties, he asserts that because he was also a secular teacher, resolution of his claims requires application of neutral principles of law and

therefore an examination of his claims would not violate the Establishment Clause. Doe also argues that even though he acknowledges his identity as a gay man, it was acceptable for him to continue in his position because he was celibate and did not speak openly about his sexual orientation.

We conclude there is no evidence showing that Doe had a position that could be split into secular and nonsecular so that they could be considered separately and, further, analysis of Does claim would require delving into church doctrine. Doe, an ordained minister, was initially "called" to his position, a process which, according to church doctrine, is guided by the Holy Spirit and God's will. The high school is a "sacred community" administered "according to the Christian understanding of the Gospel." The education provided to students is based on the scriptures of the Old and New Testament, to which teachers are asked to ascribe when teaching. As described in the facts, the synods written documents demonstrate the organization's position that "homosexuality is intrinsically sinful." Doe's assertion that he should not have been discharged based on his sexual orientation would require the court to analyze and apply church doctrine to assess his argument. We must conclude that this type of searching inquiry intrudes into church doctrine and church administrative matters and engenders a prohibited relationship between the church and the judiciary. *Singleton,* 541 N.W.2d at 612. Consequently, resolution of Doe's claims would violate the establishment doctrine of the First Amendment. *Id.; Black,* 471 N.W.2d at 720.

2. Next, Doe challenges the district court decision that his claim must also be dismissed under the Freedom of Conscience Clause of the Minnesota Constitu-

tion. The Freedom of Conscience Clause provides in relevant part as follows:

The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent, nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace or safety of the state....

Minn. Const. art. I, § 16.

■■■ The Freedom of Conscience Clause "precludes an infringement on or an interference with religious freedom and limits the permissible countervailing interests of the government." *State v. Hershberger*, 462 N.W.2d 393, 397 (Minn.1990). The court balances the compelling state interest against the least restrictive alternative. *Id.* at 398. Under this test, the following factors are considered: "[1] whether the objector's belief is sincerely held; [2] whether the state regulation burdens the exercise of religious beliefs; [3] whether the state interest in the regulation is overriding or compelling; and [4] whether the state regulation uses the least restrictive means." *Hill–Murray Fedn. of Teachers v. Hill–Murray High Sch.*, 487 N.W.2d 857, 865 (Minn.1992).

■■ As to the first factor, Lutheran High School and the synod clearly have a sincerely held religious belief. *See Odenthal*, 649 N.W.2d at 442. As to the second factor, the burden on the exercise of religious beliefs, it is clear that the state may not interfere with dismissals of clergy, because "evaluation of a minister's qualifica-

tions or fitness to preach is inherently a matter of ecclesiastical concern." *Black*, 471 N.W.2d at 719 (addressing same factor in earlier version of free exercise balancing test). But state regulation of lay employees at a religiously affiliated school that are not doctrinally related do not excessively burden the religious beliefs of the school. *Hill–Murray*, 487 N.W.2d at 866 (addressing whether application of Minnesota Labor Relations Act to lay employees violates Freedom of Conscience Clause).

Doe argues that because Lutheran High School and the synod never incorporated the religious belief that homosexuality is a sin into their employment policies and because they have no stated policy, either written or unwritten, that forbids homosexuality among its employees, the employment decision did not implicate religious beliefs, procedures, or law. He asserts he did not introduce his sexual orientation or opinions into the workplace and further that he was teaching church doctrine and never acted in a manner that would have compromised the schools religious beliefs.

But the record clearly demonstrates that Doe was not merely a lay employee. Instead, he was a campus pastor as well as a teacher of religious subjects. Lutheran High School and the synod decided that Doe should be discharged because of their ecclesiastical concerns based on their firmly held religious beliefs. Analysis of his continued qualification for his employment and the discharge decision would require analysis of those beliefs. "If courts begin to question a church's basis for doctrinal decisions, a church may be compelled to conform its religious beliefs with the governments or the majority cultures beliefs." *Geraci v. Eckankar*, 526 N.W.2d 391, 399 (Minn.App.1995), *review denied* (Minn. Mar. 14, 1995). In the same manner, if a court were to address Doe's discrimination

claim, it would also require an analysis of the basis for Lutheran High School and the synod's discharge of Doe, and they could be compelled to conform their religious beliefs to that of conflicting cultural beliefs.

As to the third factor, "the government has an overriding compelling interest in prohibiting discrimination in employment and public accommodation." *State by McClure v. Sports Health Club, Inc.*, 370 N.W.2d 844, 853 (Minn.1985). The fourth factor is whether these compelling interests can be achieved through the least-restrictive means. While the school originally allowed Doe to remain in his position until a replacement was found, provided he remain "closeted" and celibate, this less-restrictive alternative was only temporary and the ultimate discharge decision was based on protected religious beliefs. We conclude that the resolution of the arguments raised by Doe would violate the Freedom of Conscience Clause of the Minnesota Constitution.

3. By notice of review, the synod argues that it is not an employer governed by the MHRA. This issue presents a question of statutory interpretation. In analyzing such issues, the court's objective is to ascertain and effectuate the intent of the legislature. Minn.Stat. § 645.16 (2004); *Cummings v. Koehnen*, 568 N.W.2d 418, 422 (Minn.1997). "The legislature has indicated that the MHRA should be liberally construed for the accomplishment of its purposes." *Cummings*, 568 N.W.2d at 422; *see also* Minn.Stat. § 363A.04 (2004) ("The provisions of [the MHRA] shall be construed liberally for accomplishment of the purposes thereof.").

■ The MHRA prohibits "employer[s]" from discriminating in employment practices. Minn.Stat. § 363A.08, subd. 2 (2004). An employer is defined as "a person who has one or more employees."

Minn.Stat. § 363A.03, subd. 16 (2004). Minnesota courts use a four-part test to determine whether related entities should be considered a single employer. *Fahey v. Avnet, Inc.*, 525 N.W.2d 568, 572 (Minn. App.1994) (assessing number of employees for jurisdictional purposes), *review denied* (Minn. Feb. 14, 1995). Among the factors considered are: "(1) common ownership or financial control, (2) centralized control of labor relations, (3) interrelation of operations, and (4) common management." *Id.* All four factors need not be present in all cases, but the presence of one of the factors is not determinative. *Id.*

The district court, applying this test, concluded that the school is under the control of the synod to an extent sufficient to find that the synod is an employer for the purpose of applying the MHRA. We agree. First, as to common ownership or financial control, the synod and the high school are independent entities, although the high school is a recognized service organization of the synod.

The second and most important factor is whether there is centralized control of labor relations. *Id.* The synod contends the entities are completely separate. But the undisputed facts show that the synod, the southern district of the synod which Seitz heads, and the school were all involved in the process of calling Doe to the position from which he was discharged. Further, Seitz acknowledged that as district president, he was Doe's ecclesiastic supervisor and would concern himself with complaints regarding Doe's teaching, his life, or his administration of his call. Finally, Seitz met with Doe three times to discuss his sexual orientation and his future resignation based on sexual orientation. These facts show centralized control.

The third factor, the interrelation of operations, refers to whether the entities

share office space, sell services, or transfer employees. Here, there was interrelation to the extent that the synod was involved in calling ministers who may go from one service organization to another.

The fourth factor is whether the same individuals manage and control the two entities. *Id.* As discussed above, Seitz was involved both as district president for the synod and as Doe's ecclesiastical supervisor. We conclude that the synod was Doe's employer for the purpose of applying the MHRA.

4. We now address whether the synod and high school are exempt from the MHRA prohibition against discrimination based on sexual orientation under Minn. Stat. § 363A.26(2) (2004). The MHRA prohibits discharge from employment based on sexual orientation. Minn.Stat. § 363A.08, subd. 2(b). But it also exempts religious associations from this prohibition as follows:

> Nothing in this chapter prohibits any religious association, religious corporation, or religious society that is not organized for private profit, or any institution organized for educational purposes that is operated, supervised, or controlled by a religious association, religious corporation, or religious society that is not organized for private profit, from: ... in matters relating to sexual orientation, taking any action with respect to education, employment, housing and real property, or use of facilities. This clause shall not apply to secular business activities engaged in by the religious association, religious corporation, or religious society, the conduct of which is unrelated to the religious and educational purposes for which it is organized.

Minn.Stat. § 363A.26(2).

■ This exemption was applied to a church that was sued for sexual orientation discrimination by a discharged church music director, based on the determination that the music director was a church employee. *Egan v. Hamline United Methodist Church,* 679 N.W.2d 350, 355–56 (Minn. App.2004), *review denied* (Minn. June 29, 2004). The exemption was also applied to a nonprofit religious organization engaged in a religious business activity facing sexual orientation discrimination claims by a discharged mailroom employee. *Thorson v. Billy Graham Evangelistic Ass'n,* 687 N.W.2d 652, 657 (Minn.App.2004), *review denied* (Minn. Dec. 22, 2004).

Doe first contends that *Thorson* is not controlling because it is inconsistent with *Egan. Egan* analyzed the question of whether a music director was a religious employee based on the plain language of the exemption. 679 N.W.2d at 355 In contrast, using legislative history, *Thorson* determined that the statutory phrase "secular business activities" applied to the purpose and mission of the entire entity, rather than to the job responsibilities of the individual employee. 687 N.W.2d at 656. We find no conflict because *Egan* did not engage in statutory construction or address the broader question decided in *Thorson.*

Next, Doe challenges the holding in *Thorson,* arguing that this court interpreted the statute too broadly. But the supreme court denied review in *Thorson,* and appellate courts are bound by the doctrine of stare decisis, which directs that "we adhere to former decisions in order that there might be stability in the law." *Oanes v. Allstate Ins. Co.,* 617 N.W.2d 401, 406 (Minn.2000). The doctrine is not inflexible and if the reasons underlying the particular rule no longer exist or the rule no longer conforms to changed conditions of society, the court may decide not to apply stare decisis. *State v. Victorsen,* 627 N.W.2d 655, 662 n. 2 (Minn.App.2001).

Here, when the decision Doe is challenging was issued by this court in 2004 and the supreme court denied review, we choose to apply the doctrine of stare decisis.

Doe also contends that *Thorson's* broad application of the exemption to any employee whose function is any way related to the religious associations mission as a whole runs afoul of the Establishment Clause. Doe acknowledged at oral argument that this issue was not raised below but contends that it had not arisen because this court had not yet issued *Thorson.* Nonetheless, this court will not address an issue not raised to or decided by the district court. *Thiele,* 425 N.W.2d at 582–83.

The district court properly found that the religious-association exemption applied because the synod and the school are religious organizations and because Doe was a religious employee, as an ordained minister who was campus pastor and as a teacher whose responsibilities were in large part religious.

## DECISION

The district court's decision finding that the resolution of Doe's discrimination claim would violate the First Amendment and the Freedom of Conscience Clause and that the exemption for religious organizations in Minn.Stat. § 363A.26(2) (2004) applies is affirmed.

**Affirmed.**